IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | | |
|---|---|---|
| JULY R. CARLAN, | ) | |
| AKA, SHAPE SHIFTER; | ) | |
| | ) | FIRST AMENDED COMPLAINT |
| Plaintiff, | ) | FOR DAMAGES |
| | ) | |
| v. | ) | |
| | ) | REQUEST FOR |
| | ) | JURY TRIAL FOR DAMAGES |
| FENWAY COMMUNITY HEALTH | ) | |
| CENTER, INC.; | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff, July R. Carlan, aka Shape Shifter, by and through his attorneys of record, and after obtaining an expert opinion, files his Complaint against Fenway Community Health Center, Inc., Defendant, and in support thereof alleges as follows:

**INTRODUCTION**

1.  Defendant knowingly and willfully abandoned established, generally accepted clinical guidelines, recognized by Defendant as "evidence based", in providing transgender health care as a matter of policy, and in treatment of Plaintiff.

2.  Defendant's departure from the generally accepted clinical guidelines was not supported or justified by any empirical or scientific evidence, rather the decision was informed by market research carried out to increase the number of its transgender patients.

3.  The generally accepted clinical guidelines, known as "gate-keeping" served a protective function to ensure patient safety. Defendant removed those protective measures with indifference toward its potential harmful effects.

4.    Defendant's knowing and willing failure to follow generally accepted clinical guidelines caused its failure to uncover and diagnose internalized homophobia, a psychological condition that may manifest uniquely in same sex attracted persons.

5.    Internalized homophobia is the psychological condition of turning familial and societal rejection of homosexuality into self-loathing.  As a result, the person may have low self-esteem , low self-conception in terms of worth, and low acceptance of physical appearance.

6.    Internalized homophobia is linked with a number of other psychological conditions, such as depression, anxiety, compulsiveness, high-risk sexual behavior, emotional volatility, and unstable identity.  All of those symptoms were present in Plaintiff and are reported in his medical records, but internalized homophobia is not identified or explored.

7.    Internalized homophobia is the motivation for ego dystonic homosexuality, a diagnosis that is within the scope of DSM-IV-TR diagnosis of Sexual Disorder NOS ("not otherwise specified") and of ICD-10 Ego-dystonic Sexual Orientation. The two manuals were in effect at the time Plaintiff received care from Defendant.  Those diagnoses denote a condition where a person wishes to have a different sexual orientation.

8.    Defendant's deliberate failure to assess Plaintiff for internalized homophobia, a counter-indicator to transition, denied Plaintiff the benefits of healthcare on the basis of sex and sexual orientation, and made him the subject of unnecessary and harmful medical interventions.

9.    Defendant *de facto* converted a gay man to transgender, and by doing so, Defendant affirmed Plaintiff's internalized homophobia and his baseless expectation that gender transition will resolve his psychological issues.

10.     Defendant *de facto* converted a gay man to transgender because it viewed all psychological ailments through the transgender lens and failed to make differential diagnosis.

11.     Defendant failed to assess, consider, or distinguish psychological conditions that mimic gender dysphoria, but in fact are not.

12.     Defendant's biased treatment left Plaintiff's primary psychological ailments unidentified and untreated, while Plaintiff was led to believe that he was receiving comprehensive mental health care.

13.     Defendant's departure from generally accepted practices contravened existing scientific evidence, thus rendering its health care of Plaintiff experimental.

14.     Defendant did not inform or obtain informed consent for its experimental practice of providing affirmation and hormone therapy absent the then established procedures of comprehensive assessment and proper diagnosis.

15.     Through this experimental medical and psychological practice, Defendant encouraged and unduly influenced Plaintiff's pursuit of gender transition with unrealistic and groundless expectations.

16.     Defendant disregarded counter-indications, less risky alternatives, and carried on with its experimental medical practice even after Plaintiff's functioning declined and his condition worsened.

17.     Defendant's deliberate failure to explore Plaintiff's sexual orientation and its relationship to Plaintiff's recently developed transgender identity, and its encouragement of Plaintiff to transition medically, has caused, known and unknown, irreparable and irreversible physical and psychological injury to Plaintiff.

18. No amount of monetary reparation can remedy or alleviate Plaintiff's suffering or make him whole.  Defendant has caused unconscionable harm to Plaintiff that is irreversible and permanent.

19. Plaintiff seeks compensatory damages for direct actual damages for economic loss, psychological injury, physical harm, including loss of penis and testicles and loss of reproductive capacity, ongoing health complications resulting from the treatments, and pain and suffering caused by his physical injuries.

20. Plaintiff also seeks attorney's fees and costs pursuant to 42 U.S.C. § 1988(b).

## JURISDICTION AND VENUE

21. Plaintiff's cause of action arises under Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116.

22. Section 1557 creates an implied private right of action, because it incorporates by reference the enforcement mechanism of other civil rights statutes that permit a private cause of action.  *Cummings v. Premier Rehab Keller*, 596 U.S. 212, 142 S. Ct. 1562 (2022), *citing Barnes v Gorman*, 536 U.S. 181, 185 (2002).   By similar reasoning, exhaustion of administrative remedies is not required. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979).

23. An action arising under Section 1557 presents questions of federal law.  Jurisdiction is proper under 28 U.S.C. § 1331.

24. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and other applicable laws because the actions and omissions giving rise to the claim in this action occurred in Boston, Massachusetts, which is situated within the district and divisional boundaries of the Eastern

Division of the US District Court for the District of Massachusetts.  Venue is proper also because Defendant has its principal place of business in this District.

25.     An actual controversy exists between the parties involving significant civil and human rights, in that Plaintiff alleges that Defendant's policies and procedures and actions committed or omitted in accordance with them, violate Plaintiff's civil rights, while Defendant will allege their policies, procedures, actions, and omissions comport with the laws of the United States.

26.     This Court is authorized to grant Plaintiff's prayer for relief regarding damages, including reasonable attorney's fees and costs, under 42 U.S.C. § 1988(b).

## PARTIES

27.     Plaintiff, July R. Carlan, lived in Worcester and Arlington, Massachusetts, while receiving care from Defendant. Currently, Plaintiff lives in Littleton, Massachusetts.

28.     Defendant, Fenway Community Health Center, is a nonprofit corporation registered under the laws of the state of Massachusetts.  It is a community health service whose patients primarily come from the LGBTQIA+ community.  Defendant is a Federally Qualified Health Center and has received Federal funding during all relevant periods. Defendant's principal place of business is and, at all times relevant, has been in Boston, Massachusetts.

## STATEMENT OF FACTS

29.     On or near 2006, Defendant determined that its "commitment to ensure patient safety has led to some conflicts with patients" because "adherence to these [safety] priorities was time-consuming, and Fenway wasn't as quick to meet patients' expectations." Exhibit I, *History of the Fenway Transgender Health Program* 8 (undated) [hereinafter *Fenway History*].

30.   The established generally accepted clinical guidelines, recognized by Defendant as "evidence based", were time consuming because they required the clinician to get to know the patient by conducting interviews, obtaining a detailed life history, providing counseling and education prior to dispensing hormones. *Id.* at 16, 9.

31.   The generally accepted guidelines "felt like 'needless gatekeeping' for many transgender people" and they complained about Fenway's focus on patient safety. *Id*. at 9.   That is a subjective assertion.   No scientific evidence is offered in support of the assertion that gatekeeping was "needless."

32.   In 2007, Defendant decided to eliminate the requirement of counseling and invent and implement its own model of care without any empirical evidence to justify its effectiveness or safety. *Id.* at 11-16.   Defendant prioritized its market reputation and the transgender community's perceptions over medical consensus of safe healthcare.   *Id.* at 9-12.

33.   The reduced standards called for a single assessment session before providing gender affirmation services without requiring mental health counseling, and real life experience, although there was no scientific evidence that a single assessment would be sufficient or safe.

34.   Defendant's brief single assessment model did not include any protocol for attempting to identify any alternative condition to explain the patient's distress that might be a counter-indication to medical transition.

35.   Defendant did not take account of "parameters" set by WPATH Standards of Care ("SOC") version 6 (2001) that the process of psychotherapy should include "[a]cceptance of personal homosexual or bisexual fantasies and behaviors (orientation) as distinct from gender identity and gender role aspirations."

36.     Scientific studies at that time had shown that cases of transition regret were predominantly attributable to internalized homophobia.

37.     In its decision to abandon generally accepted practice, Defendant exclusively relied on those who are in psychological distress and without mental health knowledge and those whose mental health issues resolved with their transition, but Defendant overlooked the experience of regretters, and thus knowingly disregarded a safety risk to its same-sex attracted patients.   Exclusive consideration of positive outcomes in medical research is known as "survivorship bias" and renders any resulting conclusion unreliable.

38.     Defendant executed an internal program to train all of its healthcare providers in its new self-invented and untested model of care. *Fenway History* at 18.

39.     With the marketing and implementation of the new model, Defendant grew its transgender patient base from 41 in 2000 to about 366 in 2009 and to over 1,700 in 2015.  *Id*. at 7, 22. "If you build it, they will come."

40.     Defendant knowingly violated its ethical and legal duty of care when it removed safety protocols from its model of care and adopted a one-size-fits-all affirmation-only approach.

41.     Defendant provided healthcare without safeguards in the face of the likelihood that disregarding relevant sex-specific conditions would cause it to violate its legal duty not to discriminate.  Defendant has been and is an active policy advocate in the areas of access to healthcare and nondiscrimination, is well informed about the provisions of the ACA, and had actual knowledge of its legal duty not to discriminate. Yet, Defendant made no attempt to modify its model of care subsequent to the enactment of the ACA Section 1557.

42.     Defendant called its self-invented procedure a "modified informed consent model." There is no evidence that Defendant's staff were qualified to produce clinical care guidelines.

43.     There is no evidence that a patient's "informed consent" is a safe and effective replacement for assessment, diagnosis, and treatment provided by a team of appropriately trained and licensed healthcare professional.

44.     Defendant's "informed consent" model consists primarily of patient's self-diagnosis, which may be a result of confusion or a misunderstanding of medically defined terms, lack of knowledge about alternative explanations or models of care, while experiencing significant psychological distress.

45.     Defendant's "informed consent" model does not require an evaluation of the patient's medical decision-making capacity. Such evaluation is particularly important because patients who are convinced that they have gender dysphoria are under significant emotional distress and their "consent" is being given when they are highly vulnerable to undue influence from persons in position of authority and trust.

46.     Defendant's "informed consent" model does not call for assessing whether the patient has sufficiently  understood the complex consequences of transitioning, and has realistic expectations regarding the range of outcomes.

47.     Defendant's "informed consent" model does not inform the patient of alternative models of care.

48.     Defendant's "informed consent" model does not inform patients about those who regret medical interventions.

49.     Defendant's "informed consent" does not inform patients about the risk of iatrogenic effects of affirmation without meaningful assessment.

50.     Defendant's "informed consent" does not include disclosure of the non-medical factors unrelated to patient's health, such as market expansion goals and political activism that

influenced Defendant's model of care, and how those factors conflict with its objectivity and its duty to ensure patient safety.

51.     Defendant's "informed consent" model contravenes the conceptual underpinnings of informed consent, which are respect for patient autonomy and the recognition that the exercise of autonomy requires knowledge of accurate and complete information that is material to decision making.  Defendant's management of the patient is highly reckless and operates on the assumption that its model of gender affirming care is the only suitable treatment for the patient, and thus disclosure of all material information is not necessary.

52.     Defendant's "informed consent" process relies on the patient's self-report and abrogates the physician's responsibility to obtain informed consent through a process that is proportionate to the complexity of the treatment and its uncertainties.

53.     Defendant's use of the term "informed consent" contradicts statutory and common law meanings of informed consent, and is therefore deceptive and unlawful.  Defendant has no authority to override or modify the law of informed consent and invent its own laws.

54.     The record does not show that Defendant made any attempt to obtain Plaintiff's informed consent as defined by law for the experimental affirmative therapy it dispensed to Plaintiff without proper assessment and diagnosis.

55.     On November 15, 2012, Plaintiff visited Defendant's facility to inquire about hormone therapy and met with PA Julie Thompson.

56.     The record indicates that Plaintiff started "to live full-time as female" since "this past summer" and desired to change gender. Plaintiff told PA Thompson that he had been waiting to obtain hormones through a healthcare provider "to be sure it is done 'the right way.'"  The ordinary meaning of "the right way" is proper, suitable, in the right manner,

in good order, according to rules and conventions. The online Oxford English Dictionary defines "the right way" as "in the correct manner;" also "properly, thoroughly."

57.    Despite Plaintiff's request to receive care in "the right way," PA Thompson did not undertake to make a proper diagnosis or to disclose any information about Defendant's new and untested model of care, its risks and benefits, and the existence of alternative models of care.

58.    During the same meeting, PA Thompson noted Plaintiff's self-report of gender dysphoria since childhood.  Studies have shown that gender non-conformity in childhood is strongly associated with homosexuality in adulthood.  PA Thompson did not explore how Plaintiff's report of gender dysphoria relates to his sexual orientation, or his childhood trauma for the purpose of making a differential diagnosis.

59.    PA Thompson accepted Plaintiff's self-diagnosis without any evaluation or inquiry or documentation about the Plaintiff's basis for this self-diagnosis.

60.    Broadly, "gender dysphoria" is the psychological condition of a strong feeling of incongruence between one's sex and one's "gender identity". PA Thompson made no effort to assess the accuracy of Plaintiff's self-diagnosis in light of the diagnostic criteria provided in the DSM-IV-TR or ICD-10 for the diagnosis of Gender Identity Disorder ("GID").

61.    Similarly, Plaintiff's report of anxiety and "huge mood swings" resulting from gender dysphoria were beliefs that were accepted credulously and no attempt was made to corroborate Plaintiff's self-reported association.

62.    During the same meeting, Plaintiff informed PA Thompson of at least four other key facts: (1) his parents were not accepting of his homosexuality; (2) he had sexual experience at age 11 that was "consensual;" (3) he engages in high risk sexual behavior by having

10

receptive, anal sex with multiple men without using a condom; and (4) the "barrier" to his use of condoms is his "desire for pregnancy", and although the notes indicate that he understood that it is not possible for him to get pregnant, nonetheless the desire must have been strong enough to have been "psychologically blocking" him from "practicing safe sex".

63.     PA Thompson's "Impressions & Recommendations" indicate reviewing the importance of condom use, referral for therapy, without expressing any reservations about the suitability of hormone therapy for Plaintiff who relayed a history of trauma and rejection, and reported acting upon fantasies of unachievable outcomes.

64.     PA Thompson did not make an effort to learn about or explore the impact of Plaintiff's parents' rejection of his homosexuality.

65.     PA Thompson did not even attempt to explore the psychological effects of Plaintiff's sexual relations at the age of 11, and took as it true and correct that the experience was "consensual" and therefore had not traumatized Plaintiff.

66.     PA Thompson formally diagnosed Plaintiff with Hormone Disorder (ICD 259.9) without any basis in fact.  The base test of Plaintiff's hormonal level ordered by Defendant in January 2013 did not indicate any hormonal imbalance or disorder.

67.     Defendant did not evaluate Plaintiff's medical decision-making capacity to truly understand the consequences of transitioning during the initial meeting or at any time through the course of Plaintiff's treatment.

68.     In fact, Defendant ignored obvious signs that Plaintiff did not have realistic beliefs or expectations about the outcomes of transitioning, such as the desire to get pregnant or become a real woman.

69. On December 27, 2012, Plaintiff met with Sara Frawley, LMHC for a behavioral health diagnostic and intake evaluation. Plaintiff was acknowledged by Ms. Frawley as a "heterosexual-identified person" who is "seeking individual therapy and psychopharm as well as hormone assessment."

70. During that meeting with Ms. Frawley, Plaintiff reported that he had feminine expression as a child and would have been more "girly" if his parents had allowed it, that it was difficult coming out as gay to his parents which he did at the age of 16, and he wished that he could be more like his sister because of how she deals with their parents. Plaintiff also reported that his parents were hoping that therapy will "fix" him. Ms. Frawley did not inquire about what his parents meant, if she had, she would have learned that his parents were hoping that therapy will change his sexual orientation.

71. Plaintiff additionally reported a history of childhood abuse by his mother, and also having experienced assault due to his sexual orientation and "gender" both as a child and adult.

72. In that session, Plaintiff reported adopting transgender identity recently by assuming a more feminine expression, feminine dressing, and obsessing with getting pregnant, although not certain about genital surgery. Plaintiff stated that he does not hate his genitals. Plaintiff indicated enjoying sexual activity.

73. Ms. Frawley made no attempt to distinguish gender nonconforming behavior from gender dysphoria.

74. Plaintiff reported that he "previously identified as gay," and currently has multiple male sexual partners, and now identifies as heterosexual. Ms. Frawley did not explore this obvious contradiction.  Plaintiff also reported symptoms of depression, high risk sexual

behavior, and unstable relationships. All of those conditions and behaviors are associated with internalized homophobia and borderline personality disorder.

75. In performing a multi-axial psychological assessment, Ms. Frawley notably "deferred" an Axis II assessment which could have indicated a personality disorder, such as borderline personality disorder.

76. Borderline personality disorder and internalized homophobia overlap and relate in a circular way linked by the emotion of shame. Intense shame of homosexuality can destabilize the person's sense of self and the destabilization further impedes formation of a healthy identity and sexuality.

77. Ms. Frawley did not assess Plaintiff for symptoms of trauma stemming from childhood parental abuse or from sexual abuse by a stranger. Experience of trauma may produce symptoms that mimic gender dysphoria. WPATH SOC v. 7 (2011) recommends distinguishing symptoms of other psychological conditions from gender dysphoria.

78. Ms. Frawley diagnosed Plaintiff with "major depressive disorder" and "risky sexual behavior." She recommended exploration of Plaintiff's high risk sexual behavior and gender identity, and how they might relate to his depression, and how they might be impacted if he continues with transition. The record does not indicate that these minimal recommendations were in fact followed.

79. Ms. Frawley did not try to identify the cause of Plaintiff's distress. She did not diagnose Plaintiff with GID.

80. Ms. Frawley did not assess whether Plaintiff met ICD-10 criteria for GID, which includes a conjunctive test of persistent cross-gender identification coupled with persistent

discomfort with his or her sex, manifested as a preoccupation with altering one's primary and secondary sex characteristics.

81.   Because Plaintiff had clearly stated that he did not hate his genitals, enjoyed sexual activity using his penis, and did not express any pre-occupation with the alteration of his genitals, Plaintiff's condition did not meet the second element of ICD-10's definition of GID.

82.   Ms. Frawley did not assess whether Plaintiff met the DSM-IV-TR multi-part criteria for GID. To do so, she would have had to ascertain and differentiate on the basis of whether: (1) Plaintiff's cross-sex identification was motivated by perceived social advantages of the other sex; (2) Plaintiff felt discomfort with his sex; and (3) was experiencing clinically significant distress related to gender dysphoria or impairment in functioning.

83.   Plaintiff had communicated that his parents rejected his homosexuality and that he wished he was like his sister because she enjoys a better relationship with their parents, and that he had experienced discrimination and assault due to his sexual orientation. If Ms. Frawley had deeply listened to and competently assessed her client, she would have recognized that Plaintiff's desire to simulate the other sex arose from his desire to escape familial and societal homophobia and his perception that he would be in a more advantageous position socially by presenting as a heterosexual woman.

84.   Plaintiff had communicated that he did not hate his genitals and enjoyed sexual acts using his penis.

85.   Although Plaintiff reported symptoms of anxiety and depression, Plaintiff was functional. He was a straight A graduate student and was working as a Teaching Assistant. He denied having suicidal ideation.

86.   No attempt was made to ascertain whether Plaintiff's distress was related to his belief that he had gender dysphoria or other experiences and situations in his life.

87.   Similarly, Ms. Frawley did not assess Plaintiff's report of childhood dysphoria against the childhood dysphoria criteria in DSM-IV-TR. Ms. Frawley did not consider that studies have shown that "gender atypicality of childhood was more strongly associated with sexual orientation than gender identity in adulthood."

88.   Ms. Frawley did not assess whether Plaintiff met DSM-IV-TR criteria for Sexual Disorder NOS ("not otherwise specified") which encompasses "persistent and marked distress about one's sexual orientation."

89.   Ms. Frawley did not assess Plaintiff for ICD 10-Ego-dystonic Sexual Orientation, which is a condition when sexual orientation is not in doubt, but the individual wishes it to be different and may seek to change it.

90.   Despite Plaintiff's identification as gay, his rejection by his parents, his sexual compulsivity, and symptoms of depression and anxiety, Ms. Frawley did not explore Plaintiff's feelings about his sexual orientation to assess Plaintiff for internalized homophobia.

91.   Ms. Frawley was not hindered by the repeated manifestation of disordered thoughts such as "obsession" with getting pregnant, a biological impossibility, to the contrary, Ms. Frawley falsely assessed Plaintiff's "Thought Content" as normal, and cleared Plaintiff for hormone therapy.

92.   Ms. Frawley disregarded the possibility that hormone therapy may exacerbate Plaintiff's psychological symptoms potentially associated with his history of trauma, borderline

personality disorder, and internalized homophobia, all of which Ms. Frawley failed to diagnose.

93.   On that day, Plaintiff was also given a two-page list of complex potential hormone therapy side effects.  No effort was made to explain those side effects or ascertain whether Plaintiff truly appreciated those risks, but Plaintiff's "consent" signature was obtained.

94.   Plaintiff's "consent" was obtained during or at the time of his appointment for the single mental health assessment to receive hormones, a high pressure and stressful time.

95.   Plaintiff was in great distress and believed that the physical changes that can be induced by taking hormones would improve his mental health. Plaintiff was depressed and anxious, and highly vulnerable. In a state of vulnerability, Plaintiff trusted the professional healthcare providers at Defendant clinic to guide him and to provide care "the right way." In fact, Plaintiff placed a special trust in Defendant because of Defendant's long history of serving the LGB community.

96.   As a healthcare provider, Defendant exploited Plaintiff's trust and exercised undue influence in obtaining Plaintiff's "consent" to hormone therapy without sufficient assessment and disclosure.

97.   Plaintiff's "consent" was obtained without any explanation of the numerous potential adverse side effects or its potentially unknown effects.  Defendant made no attempt to verify that Plaintiff appreciated and understood the information and was able to consider and evaluate the information while in great emotional distress.

98.   Defendant never obtained consent for its experimental "integrated affirmative care" and psychotherapy.

99.    Subsequent to Ms. Frawley's rubber stamping single appointment, PA Thompson concluded that there was no counter-indication to "hormone therapy" and prescribed estrogen for Plaintiff on January 14, 2013.

100.    Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline (2009) is clear that "eligibility" for hormone therapy requires a DSM diagnosis of GID, and absence of co-morbid psychiatric conditions that can interfere with the treatment.

101.    The Endocrine Society's Guideline "readiness" criteria requires a demonstration of progress by the patient in controlling any identified psychological issues as well as mental stability.

102.    Plaintiff was not diagnosed with GID and was not evaluated for the presence of any personality disorder. To the extent any psychological issues were identified, Defendant did not wait to see if Plaintiff would have indeed made progress to bring those conditions and behaviors under control without risky medicalization.

103.    "To be valid, a prescription must be issued for a legitimate medical purpose … As with every aspect of medical care, a physician's prescription practices should be guided by medical knowledge, best-practices, guidelines and consensus standards." Commonwealth of Massachusetts Board of Registration in Medicine, *Prescribing Practices Policy and Guidelines* v, 29 (Policy 89-01 Adopted August 1, 1989; Amended November 17, 2010).

104.    PA Thompson prescribed hormones without a meaningful evaluation of Plaintiff and without a diagnosis of GID. There was no medical indication that Plaintiff needed the medication or would benefit from it.  The prescription had no legitimate medical purpose.

105. Ms. Frawley and PA Thompson approved and prescribed hormones without appropriate supervision of a physician.

106. PA Thompson's notes state that Plaintiff "reports" understanding risks and benefits of hormone therapy, although it is the healthcare provider's responsibility to assess, to be distinguished from self-report, whether the patient understands risks and benefits.

107. Plaintiff reported that "internet" is one of his hobbies. PA Thompson did not explore whether Plaintiff's self-diagnosis and reports of understanding risks and benefits of transition were influenced by the misinformation disseminated by trans-activists online who encourage the psychologically vulnerable to identify as transgender and justify it as a solution to their emotional problems, to join and grow the transgender "community" and fulfill their deep need for belonging.

108. Defendant did not assess Plaintiff's functional decision making capacity to understand and appreciate the serious and adverse consequences of the medical interventions, including potential adverse cognitive and psychological effects, about which no meaningful information was provided.

109. Plaintiff was an ambitious straight A student aiming to obtain a PhD and pursue entrepreneurial dreams. He would not have risked cognitive impairment had he understood the risk.

110. Defendant did not ascertain whether Plaintiff's expectations and goals of transitioning were realistic and achievable.

111. Defendant did not disclose that estrogen may cause mental and physical changes that may induce dislike of his genitals.

112. The record does not support PA Thompson's notes of January 4th stating that she reviewed disclosures relevant to consent with Plaintiff, and that he understood and signed consent forms. Defendant had already obtained Plaintiff's "consent" signature on December 27th.

113. Defendant also prescribed Plaintiff spironolactone, an anti-androgen, to inhibit the production of testosterone, which can cause effects associated with hypogonadism, such as mental fog, fatigue, low mood, and low libido. Defendant made no disclosure regarding the potential side effects of anti-androgens.

114. Defendant's policy and practice disregarded the criteria set forth in the DSM-IV-TR, ICD-10, the recommendations of the American Psychological Association (APA) Guidelines for Psychological Practice With Lesbian, Gay, and Bisexual Clients (2012) (APA Guidelines), Endocrine Society Guideline (2009), and even WPATH SOC v. 7, which includes an assessment sufficient to make differential diagnosis.

115. A healthcare provider would necessarily need to get to know the patient over a period of time in order to be able to make a differential diagnosis, but Defendant had already decided that such a time-consuming process was "unnecessary".

116. In their clinical decisions, both PA Thompson and Ms. Frawley over-relied on Plaintiff's feminine expression, self-diagnosis of childhood and adulthood dysphoria, and his claim that he understood risks and benefits of transition.

117. Neither PA Thompson or Ms. Frawley carried out a meaningful assessment to distinguish the seeming presence of gender dysphoria from gender nonconforming behavior or other psychological conditions that imitate gender dysphoria, or to evaluate his level of comfort with his sexual orientation and its relationship to his recent identification as transgender.

118.   Within two months of taking spironolactone and estrogen, Plaintiff's depression significantly worsened. On March 22, 2013, Plaintiff reported "crying daily for no particular reason, lack of motivation, inability to concentrate on school." PA Thompson did not recognize these symptoms as a counter-indication to the continuation of hormone therapy. PA Thompson failed to appropriately monitor Plaintiff's response to hormone therapy.

119.   Defendant's model of care is an undifferentiated one-size-fits-all affirmation-only model that is tantamount to hormones on demand, even though the use of hormones requires a diagnosis, physician's prescription, and supervision.

120.   On March 4, 2013, Plaintiff met with Mark Rehrig, LICSW, who, without any evaluation, validated Plaintiff's "gender identity" and disregarded his sexual orientation.

121.   Validation of gender identity is a powerful psychotherapeutic intervention that can contribute to persistence of dysphoria by enabling avoidance of the patient's real issues.

122.   Defendant's affirmation-only model destroys therapist's objectivity and exploits the therapist's influence to approve or disapprove of the patient's thoughts instead of supporting the patient in reflection and exploration of difficult emotions, and reaching his own conclusions.  It adversely interferes with the patient's maturation process which is an element of therapy.

123.   At the time, Plaintiff was a very young adult, only 22 years old, trying to find himself after a traumatic childhood and adolescence. Defendant's affirmation coupled with "hormone therapy"  closed off the opportunity for neutral exploration, learning, and growth. Defendant did not give Plaintiff the chance or the tools to find himself.

124. Mr. Reghrig "diagnosed" Plaintiff with "internalized transphobia," because of Plaintiff's desire to "be seen as more than a trans woman." Mr. Rehrig recommended that Plaintiff contact the transgender community for "normalization" and "decreasing transphobia."

125. Once again, the transgender bias interfered with Defendant's professional judgment and treatment of Plaintiff. Mr. Rehrig did not explore the meaning of Plaintiff's desire to "be seen as more than a trans woman" in the context of Plaintiff's motivations and expectations.

126. Plaintiff had expressed the desire to become a "real woman." Plaintiff was motivated by the unachievable fantasy that he could change sex and had not grasped the fact that transition will merely enable him to mimic the opposite sex. Instead of clarifying that it is not possible to change sex, Mr. Rehrig carried on Defendant's gimmickry and labeled Plaintiff with "internalized transphobia." In effect, Mr. Rehrig affirmed Plaintiff's fantasy as realistic and achievable, although the fantasy cannot be validated against material reality.

127. Mr. Rehrig did not try to understand his patient; rather, he was acting on certain ideological assumptions and envisioning certain outcomes.

128. Defendant's "best practices" specifically instructs staff to avoid using terms like "real woman," thereby laying the foundation for not listening to one's patient to understand the patient's motives. Exhibit II, *Affirmative Care for Transgender and Gender Non-Conforming People: Best Practices for Front-line Healthcare Staff* 3 (undated) [hereinafter *Best Practices*].

129. The distortion of language in healthcare can engender harm in at least two ways: causing miscommunication, and instigating undue influence by reshaping perceived reality, however unsubstantiated.

130.   In expressing his desire to become a real woman, Plaintiff was not thinking of others or expressing any "phobia" about transgender people. Rather, Plaintiff was communicating his desire to escape being a real man who is sexually attracted to men; believing that he could be a real heterosexual woman.

131.   Mr. Rehrig made no effort whatsoever to understand Plaintiff's belief system or to challenge him by informing Plaintiff that all physical changes are cosmetic and will not achieve his objective of changing sex.

132.   Plaintiff's stated desire to become a real woman exhibited his inability to (1) understand his situation and its implications; (2) offer a rational reason or realistic objective for seeking transition; (3) understand the risks/benefits of transition; and (4) understand and evaluate the range of possible outcomes.

133.   This course of conversation, with Plaintiff stating his desire to become a real woman and Defendant responding by labeling him with internalized transphobia, is repeatedly reported throughout the remainder of the record prior to surgery. Yet, Defendant did not engage in an informational discussion with Plaintiff, and continued to encourage his transition through affirmation.

134.   Under Defendant's undue influence exercised through affirmation, use of false labels, and prescription of medically unnecessary and counter-indicated hormones, by the end of July 2013, Plaintiff was seeking referrals for multiple cosmetic surgeries to feminize his face and body and expressing interest in Gender Reassignment Surgery ("GRS"), which Defendant referred to as sex reassignment surgery. Again, Defendant's pervasive misuse of language subtly reinforced Plaintiff's false belief that he could change sex.

135. On November 4, 2013, PA Thompson reported that Plaintiff has been on hormones for eleven months without adverse side effects and increased the prescribed dose of estrogen. PA Thompson grossly failed to consider Plaintiff's worsening depression and evaluate his general life functioning.  She also inexplicably entered the bogus diagnosis of "Agenesis of the Cervix" in Plaintiff's record.  "Agenesis of the Cervix" or cervical agenesis is the congenital absence of the cervix in females. It is a birth defect and cannot be acquired during life. Males do not have cervixes.

136. By mid-December 2013, Plaintiff reported inconsistent use of hormones and testosterone blockers to regain erectile function and was engaged in high risk sexual behavior.  Neither of these behaviors caused Defendant to reconsider its course of treatment.

137. With Defendant's encouragement Plaintiff attended First Event conference in Boston in or about January 2014 to find plastic surgeons who perform cometic "feminizing" surgeries. Plaintiff did not visit Defendant clinic again until about one year later while undergoing multiple "feminizing" cosmetic surgeries on his face and body. On December 12, 2014, Plaintiff met with Sarah Eley, LICSW to request psychotherapy and also letters of approval for GRS.

138. Ms. Eley's notes indicate that Plaintiff (1) suffered from depression and anxiety; (2) sought validation through sexual activity; (3) struggled with sexual compulsivity and hoped that GRS would reduce his sexual urges; (4) did not want to take hormones so he could enjoy sex with a functioning penis; (5) wanted to pursue a PhD in finance, but could not find a job in that field despite possessing an MBA and a Masters in Finance, therefore he "begun a career in strip dancing", and this situation caused stress in his "financial life and around

self-confidence." Plaintiff also revealed that he did not disclose his work to friends and family.  He reported feeling ashamed of his work.

139.   The corrosive effects of strip dancing on Plaintiff and his inability to find a job in finance, despite his qualifications, were not addressed as a decline in Plaintiff's functioning. In Defendant's view, strip dancing was just a new career.

140.   Ms. Eley did not explore Plaintiff's feelings about his sexual orientation.

141.   Ms. Eley did not inform Plaintiff that GRS is not a treatment for sexual hyperactivity.

142.   Ms. Eley did not explore Plaintiff's contradictory positions of wanting to pursue GRS to reduce his sex drive and not wanting to take hormones so he could have sex.

143.   Ms. Eley did not express any concern regarding Plaintiff's inconsistent use of hormones, or identify it as a counter-indicator, despite the fact that the consistent use of hormones would be required subsequent to GRS in order to support physical health.  She did not inform Plaintiff of this important post-GRS requirement.

144.   The inconsistency in Plaintiff's behavior and verbally stated desires indicated that Plaintiff lacked stable values and goals, thus bringing into question his intent and capacity to consent to the continuation of the treatments provided by Defendant. Plaintiff's inconsistency did not cause Defendant to pause, reconsider or alter any aspect of the treatment.  Defendant did not consider that objective inconsistency between Plaintiff's stated goals and behaviors potentially indicate borderline personality disorder, and relentlessly continued with its affirmation therapy.

145.   Ms. Eley did not evaluate the significant decline in Plaintiff's life functioning, such as separation from partner and inability to find a job in finance despite his qualifications.  To

the contrary, Ms. Eley falsely noted that Plaintiff had no history of difficulty maintaining employment.

146.   Ms. Eley identified symptoms and behaviors, such as compulsivity and sexual risk taking typically associated with borderline personality disorder and internalized homophobia, but did not use any diagnostic tests or exercise reasonable clinical judgment to make a diagnosis consistent with those symptoms.

147.   Ms. Eley recorded a multi-axial diagnosis, but omitted an Axis II assessment for personality disorders despite numerous symptoms shown.

148.   Instead of taking a whole person approach in treating Plaintiff, Ms. Eley took a disjointed view of Plaintiff's condition as an unrelated set of symptoms. As a result, she failed to identify Plaintiff's mental conditions and the appropriate treatments.

149.   Ms. Eley recommended one year of individual psychotherapy for Plaintiff with a focus on "gender affirmation, covering necessary information in order to obtain letters for GRS referral, exploration of sexual compulsivity, using harm reduction approach and motivational interviewing, reducing impulsive, safety risk taking [sic] and sexual risk taking behaviors. Confidence building, adaptive coping skills development."

150.   There is no evidence that any of these recommendations, other than gender affirmation, were implemented or that Plaintiff's symptoms ameliorated.

151.   On February 18, 2015, Plaintiff met with Samantha Manewitz, LICSW, to commence behavioral health treatment with a view toward obtaining GRS approval letters.  Plaintiff reported acute dysphoria around his genitals and "hopes that her libido will decrease once she has undergone GRS."

152. Ms. Manewitz recommended nine months of weekly therapy, a shorter period than Ms. Eley's recommendation of one year of therapy, to provide Plaintiff with the skills to control compulsive sexual behavior, set boundaries in intimate relationships, implement safety measures, and regulate affect.

153. The behaviors identified by Ms. Eley and also by Ms. Manewitz for modification are among the symptoms and behaviors associated with borderline personality disorder and internalized homophobia, which are counter-indicators to transition.

154. Ms. Manewitz did not explain to Plaintiff that GRS is not a treatment for hypersexuality.

155. Between February and June 2015, Plaintiff had ten therapeutic sessions with Ms. Manewitz. Throughout, clinical notes repeatedly indicate Ms. Manewitz's affirmation of Plaintiff's transgender identity and "straight" sexual orientation, "diagnosis" of "internalized transphobia", as well as Plaintiff's continued "compulsive" and high risk sexual behavior, and inability to maintain interest in relationships or set boundaries, all of which are symptoms of borderline personality disorder and internalized homophobia. Ms. Manewitz, however, did not make any such diagnosis. Ms. Manewitz did not take a whole person approach in treating Plaintiff, rather she took a disjointed view of the patient's condition as an unrelated set of symptoms.

156. Ms. Manewitz did not explore Plaintiff's feelings about his sexual orientation.

157. The clinical notes from the ten sessions are remarkably boilerplate, repetitive and short of current information. There is no indication that Plaintiff made any progress toward achieving any of the therapeutic goals.

158. Despite the initial recommendations of one year therapy that was reduced to nine months without explanation, on March 11, 2015, during or immediately after the second session of

therapy, Ms. Manewitz co-signed a GRS approval letter. The letter is co-signed by Kevin Kapila, MD.  Dr. Kapila approved Plaintiff for castration without ever meeting him.

159. Between February and June 2015, Plaintiff met four times with Alex Keuroghlian, MD for the purpose of obtaining a second GRS approval letter. Three of those meetings were only twenty minutes long. Session notes reflect brief, superficial discussions, and conclusory assessments of Plaintiff's history and current conditions.

160. Dr. Keuroghlian's notes exhibit unfamiliarity with Plaintiff's history reflected in Defendant's own treatment records.

161. On June 5, 2015, Dr. Keuroghlian signed a second GRS approval surgery. Dr. Keuroglian's letter is remarkably similar to Ms. Manewitz's letter in content and language.

162. Both letters claim that Plaintiff had early childhood gender dysphoria, and no co-morbidity that should preclude surgery. Both letters state that Plaintiff "is fully aware of the benefits, risks, and consequences of such surgery and is competent to make informed healthcare decisions."

163. The record, however, does not indicate any meaningful evaluation of Plaintiff's mental condition, expectations, or his capacity for medical decision making in this particular context.

164. Defendant did not ascertain Plaintiff's expectations from transition, nor inform Plaintiff about the limitations of psychological and physical effects that may be achieved through surgery, nor the post-surgical limitations Plaintiff may experience in social, romantic, sexual, and occupational spheres.

165.   Both letters of GRS approval state that Plaintiff meets the criteria for gender dysphoria and GID diagnosis and that the criteria set forth in WPATH Standards of Care have been "met or exceeded."

166.   Although Defendant referenced WPATH in its letters approving Plaintiff for castration, Defendant's practice disregarded WPATH SOC v. 7 statement that "[t]he role of mental health professionals includes making reasonably sure that the gender dysphoria is not secondary to or better accounted for by other diagnoses."

167.   Plaintiff does not hereby concede that WPATH SOC v. 7 constitutes valid and evidence based standards of care. Defendant's reference to and reliance on WPATH is *petitio principii*— fallacious and circular.  Defendant claims to satisfy WPATH standards while WPATH claims to rely on Defendant's practice in formulating its standards.

168.   WPATH references Defendant's practice as support for its standards of care. Defendant admittedly removed its "gate-keeping" procedures without any supporting scientific evidence. Therefore, WPATH standards of care are not evidence based and scientific.

169.   The DSM-5 is clear that gender non-conformity should be distinguished from gender dysphoria.    The process of differentiation includes ruling out other psychological conditions that imitate gender dysphoria, such as identity disturbance in borderline personality disorder.

170.   The record does not indicate any effort by Defendant to carry out differential diagnosis. Defendant deliberately left out Axis II personality disorder assessment at least two times. Defendant ignored the presence of borderline personality disorder symptoms for diagnostic and treatment purposes. Borderline personality disorder and internalized homophobia are linked conditions.

171.   The record does not even indicate a diagnosis of gender dysphoria until after Plaintiff had undergone GRS and was feeling dysphoric from his surgically modified body.

172.   Defendant did not try to alleviate Plaintiff's distress through the use of less harmful means, and employed the most radical treatments from the very beginning.  Nothing in the record justifies the medical necessity of the harmful and irreversible interventions encouraged and implemented by Defendant.

173.   Defendant grossly failed to assess for  internalized homophobia or diagnose ICD 10-Ego-dystonic Sexual Orientation, also known as ego dystonic homosexuality.

174.   Throughout its treatment of Plaintiff, Defendant also did not heed the APA Guidelines which recommend that therapists carefully assess motives of clients who wish to change their sexual orientation by identifying and addressing internalized stigma that may have a negative effect on the client's self-perception.

175.   Plaintiff reported to Defendant that he came out as gay at the age of sixteen and that coming out was difficult due to his parents' rejection of his sexuality, but now Plaintiff identifies as male to female "heterosexual".

176.   Latching on to transgender identity and identifying as "straight," in effect, was Plaintiff's attempt to escape parental and social disapproval of his sexual orientation through the manipulation of language and appearance.

177.   The implications of labels cannot be underestimated when the individual has suffered parental and societal rejection precisely because of that identification and label. That label and its associated social disapprobation may be avoided  by changing either one's sexual orientation or by one's gender.

178.   Historically, some societies forced conversion of gay men to trans-feminine by forcing the use of cross sex hormones and/or castration as a method of asexualizing gay men. Today, homophobic governments encourage this form of gay conversion which is sometimes coerced and sometimes "consented" to due to lack of accurate information about homosexuality and dissemination of misinformation that leads many gays and lesbians to believe that they are transgender.  However, even in such society a physician may still turn away misinformed or confused gay men. *Why Iran is a Hub for Sex-Reassignment Surgery*, The Economist (Apr. 4th, 2019).

179.   The UN Independent Expert reported on this practice as "converting" or "neutralizing" sexual orientation. The Independent Expert stated that medical or surgical gay conversion practices "can amount to cruel, inhuman or degrading treatment" under the Convention Against Torture, and also violate the right to non-discrimination and the right to health. Report of the Independent Expert on protection against violence and discrimination based on sexual orientation and gender identity, A/HRC/44/53 (15 June-3 July 2020), ¶¶ 49, 59-65.

180.   The situation described in Iran is instructive on two matters: (1) it highlights the importance of access to accurate information about homosexuality, sexual identity, and gender identity in self-understanding, and by extension exposing the highly erroneous and harmful nature of self-diagnosis or undifferentiated diagnosis; and (2) it underlines the need for heightened legal protection of same-sex attracted persons to ensure that they receive adequate psychological support as well as accurate and complete information to facilitate the full and authentic development of their personality.

181.   Sexual orientation is immutable, therefore distorting language can become seductive to those who are seeking to escape. The language game creates the possibility to use the socially accepted label of heterosexual and offers the superficial and unscientific explanation that the gay man was born in the wrong body.  It is the healthcare provider's duty to assess the patient's condition accurately.

182.   In Defendant's view, however, sexual identity is no more than a self selected label. According to Defendant "[s]exual orientation is about how people identify their physical and emotional attraction to others. It is not related to gender identity. Transgender people can be any sexual orientation (gay, lesbian, bisexual, heterosexual/straight, no label at all, or some other self-described label)." *Best Practices* at 3.

183.   Defendant's definition and its validation of Plaintiff, a gay man, as heterosexual or straight have no scientific basis, and are rooted in gender ideology which denies the significance of biological sex. If sex has no fixed and verifiable meaning, then homosexuality cannot have any meaning either. That belief system interfered with Defendant's ability to recognize and treat Plaintiff's internalized homophobia.

184.   In contrast with Defendant's definition, the APA Report on Therapeutic Responses to Sexual Orientation (2009) (the "APA Report") defines sexual orientation as "a complex human characteristic involving attractions, behaviors, emotions, and identity."  The APA Report goes on to explain that "sexual orientation refers to an individual's patterns of sexual, romantic, and affectional arousal and desire for other persons based on those persons 'gender and sex characteristics. Sexual orientation is tied to physiological drives and biological systems that are beyond conscious choice and involve profound emotional feelings."

185.    Sexual orientation is complex, multi-dimensional, and innate.   It is not a choice. Defendant's reduction of that concept to mere self-identification reflects an ideological bias that interferes with good communication and the provision of competent and appropriate healthcare. It also increases the allure of the label game as an escape from the stigma of homosexuality.

186.    The APA Report notes that while sexual orientation does not change, sexual orientation identity may shift, and therapists should provide a safe space for exploration of the self, and provide targeted treatments that address personal beliefs, feelings of shame, and "self-stigma."

187.    The APA Report supports affirmation of sexual orientation when a patient seeks to change his sexual orientation. The elements of the affirmative approach are: "(a) acceptance and support, (b) a comprehensive assessment, (c) active coping, (d) social support, and (e) identity exploration and development."

188.    In contrast with the APA's model of affirmation, Defendant's affirmation model mainly consists of affirmation and employment of politically correct language, without any meaningful assessment or identity exploration.

189.    The APA Report continues to explain that a comprehensive assessment should include: "understanding how a client's distress may involve (a) psychological disequilibrium from trying to manage the stressors (e.g., anxiety, depression, substance abuse and dependence, sexual compulsivity, post-traumatic stress disorder) and (b) negative effects from developmental experiences and traumas and the impact of cultural and family norms."

190.    The APA Report further emphasizes "that identity issues, particularly the ability to explore and integrate aspects of the self, are central to the appropriate application of affirmative

therapeutic interventions for adults presenting with a desire to change their sexual orientation."

191.   Defendant had determined that getting to know one's client is "time consuming" and "unnecessary", therefore Defendant knowingly and willfully chose not to assess Plaintiff's sources of distress, learn his history, and explore his sense of self and identity, and whether transition was a form of escape from his homosexual identity and a manifestation of his internalized homophobia.

192.   The APA Guidelines recommend that therapists check their own background, beliefs, and values that may influence their assessment and treatment of gay and lesbian clients, yet Defendant's practice was riddled with "confirmation bias", *i.e.*, viewing all ailments through the transgender lens.

193.   Defendant's failure to make differential diagnosis was rooted in its ideological bias that self-diagnosis is accurate, and that all psychological ailments should be viewed as gender related, rather than providing individualized care and working to understand each individual patient's motivations, expectations, and needs.

194.   Defendant's perfunctory labeling of Plaintiff with "internalized transphobia" without justification is one example of Defendant's transgender bias, and practice based on unverified assumptions.

195.   As a result of its transgender bias, and its business motivated intentional and illegitimate departure from generally accepted procedures, Defendant knowingly overlooked Plaintiff's symptoms of trauma, internalized homophobia, and borderline personality disorder which were linked with his sexuality, femininity, and the rejection of those attributes by his family and society.

33

196.    Through counter-indicated affirmation and unnecessary hormone therapy, which can have adverse psychological and cognitive effects, Defendant asserted and exercised undue influence and led Plaintiff through the transition process which has irreversibly harmed Plaintiff's mind and body.

197.    Plaintiff has also sustained psychological injury from Defendant's failure to identify his true psychological conditions and treat them, which foreseeably went untreated and worsened.

198.    Under Defendant's care and affirmation, Plaintiff experienced significant decline in his functioning.  Defendant failed to monitor Plaintiff for adverse effects of its experimental treatment.  Plaintiff arrived at Defendant clinic as an honors student, a Beta Gamma Sigma member, a CPA, who was working as a Teaching Assistant with ambition to obtain a PhD, but within approximately 18 months of starting treatment with Defendant, Plaintiff was unable to find a job in finance and was strip dancing, was living apart from his partner, developed ADHD, and was feeling increasingly uncomfortable with his own body.

199.    Subsequently, Plaintiff has developed osteoporosis, scoliosis, and persistent mental fog. Although taking testosterone improves his mental clarity, it also causes him to experience phantom penis, including an internal sensation of male sexual arousal, which cannot be satisfied.  Plaintiff is faced with the impossible choice of improving his cognitive mental state and suffering the psychological and physical effect of phantom penis and high libido, or taking estrogen and suffering mental fog and fatigue, but no phantom penis and low libido.

200.    Regardless of which hormone he takes, Plaintiff suffers from sexual dysfunction and is unable to enjoy sexual relations.  Plaintiff is unable to engage in penetrative sex because

his penis was ablated with Defendant's approval. Plaintiff is unable to engage in receptive sex because the cavity created by inverting his penis has closed, and anal sex is painful and leads to no orgasm or weak and painful orgasm.  Masturbation does not produce sexual joy due to the weak sensations it produces.  Oral sex is not enjoyable because of his overall experience of weak sexual sensations.

201.   Defendant's issuance of boilerplate letters approving Plaintiff for GRS, without proper and thorough assessment, has directly caused extreme and outrageous, irreparable and irreversible physical and psychological harm to Plaintiff, including, but not limited to, genital mutilation, sexual dysfunction, cognitive decline, and exacerbation of his pre-existing psychological conditions which were unidentified and untreated.

202.   But for the approval letters issued by Defendant, no surgeon would have ablated Plaintiff's penis and testicles.

203.   Defendant outrageously, knowingly, recklessly, and callously affirmed a gay man as transgender and neutralized his sexual orientation by castrating him.  Defendant despicably repeated and revived the historical oppression of the "insular and discrete minority" of effeminate gay men who have been historically rejected and discriminated against not only on the basis of their sexual orientation, but also on the basis of their effeminate expression.

204.   As a result of the unnecessary interventions approved by Defendant, Plaintiff has suffered multifarious physical and psychological harms, including having to live for the rest of his life with dissonance between who he is and how he appears, and not being able to express himself as a gay man.  The physical changes induced by Defendant's unnecessary treatments are permanent and irreversible.

**PLAINTIFF'S ACTION IS TIMELY**

205.   Plaintiff's cause of action was created by the ACA which was enacted in 2010. The ACA neither provides nor references a statute of limitations.

206.   An action "arising under" a federal statute enacted after 1990 is subject to the time limitation set forth in 28 U.S.C. § 1658(a). *Tomei v Parkwest Med. Ctr.*, 24 F.4th 508, 511-515 (6th Cir. 2022); *Vega-Ruiz v. Northwell Health*, 992 F.3d 61, 66 (2d Cir. 2021).

207.   An action subject to Section 1658 "may not be commenced later than 4 years after the cause of action accrues."

208.   Accrual is the date the statute begins to run, but it is not necessarily the same as the date when the injury occurred. Accrual begins when "when the plaintiff has 'a complete and present cause of action.'" *Wallace v Kato*, 549 U.S. 384, 388 (2007).

209.   The First Circuit Court of Appeals has held that a claim accrues when "the plaintiff knows, or in the exercise of reasonable diligence should know, (1) of [his] injury and (2) sufficient facts to permit a reasonable person to believe that there is a causal connection between the [defendant] and [his] injury." *Skwira v United States*, 344 F.3d 64, 78 (1st Cir. 2003); *Callahan v United States*, 426 F.3d 444, 451 (1st Cir. 2005); *Armstrong v Lamy*, 938 F. Supp. 1018, 1039 (D. Mass. 1996).

210.   In the instant case, the accrual date is on or about May 10, 2022, when Plaintiff publicly announced that he is detransitioning.

211.   Transition requires a significant investment of emotional and physical energy.  It is a state of mind and is a major commitment that is accompanied by deep hopes for a better future. That commitment is affirmed and crystallized by professionals who approve of the treatments as medically necessary. Consequently, the patient comes to firmly believe that life improvements are dependent on adjustment to the new identity and the new body.

212. Dr. James Cantor explains: "Unlike physical procedures undertaken for their physical effects, medicalized transition is undertaken in hope and expectation of the psychological and social effects would trigger. Unlike the physical outcomes of physical procedures, the psychological and social outcomes (or lack thereof) and the failure of medicalization to alleviate the dysphoria are not immediately apparent."

213. Post-GRS therapeutic records, dated October 2015 - January 2016, show that Defendant repeatedly diagnosed Plaintiff with "adjustment disorder" and his need to improve "distress tolerance."

214. The emphasis on the need for adjustment and tolerance places the burden on the patient to simply accept and adjust to the harm as a normal and acceptable feature of the process of reaching that happier future rather than question the harm and explore its cause. Further, it encourages the hope that with sustained effort life will improve and the goals of transition will be realized. Therefore, the actual cause of suffering is not readily discernible.

215. Detransitioning is a reckoning experienced as an explosion of all the psychological issues that were left untreated, avoided and repressed due to improper therapy. It ensues from a deeper self-understanding due to maturation and increased self-reflection that is triggered by a combination of factors over a period of time that forces an examination of oneself and one's life circumstances.

216. In 2020, Plaintiff began to experience back pain, and in 2021, he was diagnosed with osteoporosis and scoliosis caused by hormonal suppression resulting from the treatments prescribed and approved by Defendant.

217.   In addition to those serious health concerns, during the same period, Plaintiff was experiencing difficulties in his intimate relationship due to his inability to regulate his emotions and control his emotional impulses.

218.   In or about January 2022, Plaintiff was prescribed a combination of estrogen and testosterone for the treatment of osteoporosis.

219.   Reintroduction of testosterone to Plaintiff's body had physical and psychological impact.

220.   Low levels of testosterone can cause loss of interest in sex, fatigue, depression, and "mental fog" in men, and may also exacerbate pre-existing mental health conditions. Plaintiff experienced all of those effects, but the reintroduction of testosterone into Plaintiff's body somewhat modified those effects.

221.   After taking testosterone, Plaintiff found that he had more energy, greater mental clarity, and increased sex drive. These newly acquired traits combined with the deterioration of his physical health, break up of an intimate relationship, and maturation caused Plaintiff to reflect deeply on the conditions of his life and their cause.

222.   Plaintiff's regaining of sexual interest had both physical and psychological effects.

223.   The physical effect is Plaintiff's sensation of a phantom penis, including sensation of male sexual arousal, which cannot be satisfied due to the sexual dysfunction caused by the ablation of his penis approved by Defendant.

224.   Psychologically, Plaintiff recognized his desire for gay sex (ie, sex between biological males with male appearance and their genitals in tact) and realized that he could not have it, that he could not engage with gay men due to the permanent changes that were made to his body. With that realization, he was forced to reckon with the reality of his sex and sexual orientation. He was compelled to acknowledge to himself that he is not a woman

38

and that he is tired of pretending to be one. He was compelled to acknowledge that he is an effeminate gay man.

225.    Plaintiff undertook to research his own symptoms, and sought therapy in February 2022.

226.    Subsequently, Plaintiff came to realize that he had body dysmorphia, unresolved childhood trauma, internalized homophobia, and borderline personality disorder.

227.    Plaintiff realized that his transgender identification was rooted in his internalized homophobia, and his desire to avoid familial and social disapprobation of homosexuality, and femininity in men.

228.    In May 2022, Plaintiff publicly announced that he is a detransitioner.

229.    Because the physical changes that result from medical and surgical transition are irreversible, detransition is generally understood to refer to the person's state of mind.

230.    Defendant willingly, knowingly, and recklessly abandoned the generally accepted standards of care and chose not to explore the relationship between Plaintiff's sexual orientation and transgender identity, and affirmed Plaintiff as transgender and "straight" without a meaningful assessment.

231.    The transgender identity and "straight" sexual orientation affirmed by Defendant reinforced Plaintiff's internalized homophobia and Plaintiff's desire to escape from his own homosexual identity.

232.    Affirmation is not a neutral act. It has a narrowing and constraining psychological effect. It also places a seal of approval on the patient's motivations and expectations from a health care provider.

233.    Inappropriate affirmation is iatrogenic. Iatrogenic illness is a harm suffered by the patient that was caused by health care providers. Inappropriate affirmation misdirects the

investigation of the cause of the patient's discomfort, and thereby prolongs the trajectory of any unidentified conditions and also leads to the pursuit of inappropriate treatments that cause harm.

234.   Affirmation without proper assessment reinforces an identity that may be a symptom of a condition other than gender dysphoria, with the double harm of giving professional stamp of approval and correctness to the wrong identity, and leaving the underlying condition unidentified and untreated, which will foreseeably exacerbate over time.

235.   The affirmed identity consequently is invigorated and animated in the mind of the patient along with hopes and dreams of a new life that will be devoid of psychological and social problems, a desirable future to be realized through this new identity and the patient's continuous efforts to live the new identity.

236.   Defendant's knowing, willing, reckless, and inappropriate affirmation of Plaintiff as transgender distorted and constricted Plaintiff's perceptions and affirmed his disordered thoughts and unrealistic expectations, thereby contributing to the delay in Plaintiff's realization of the wrong committed against him.

237.   Plaintiff sustained psychological injury under Defendant's care.  "An injury to the mind could interfere with the discovery of the cause of action." *Riley v. Presnell*, 409 Mass. 239, 246, 565 N.E.2d 780 (Mass. 1991).

238.   When would have a reasonable person in Plaintiff's position discovered the cause of his suffering? Studies indicate that on average this shift in thinking and the subsequent recognition of the harm and its cause occur in approximately 5-10 years after transition.

239.   Barring Plaintiff's claim would be gravely unjust to Plaintiff as he has suffered harrowing and unconscionable physical and psychological injury that not only were caused by

Defendant's intentional actions and omissions, but the discovery of the harm itself and its cause were also delayed due to the same actions and omissions.

240.   Defendant will not be prejudiced as a result of this action, because Plaintiff's allegations are overwhelmingly corroborated by the medical records and the historical reports created by and maintained by Defendant itself.

241.   Plaintiff became a detransitioner on or around May 2022. Plaintiff's claim under Section 1557 is brought within four years of his recognition of the wrong he suffered and its causal link to Defendant. Plaintiff's action is timely.

## CAUSE OF ACTION

### Violation of Section 1557 of the ACA, Prohibition on Discrimination in Healthcare: 42 U.S.C. § 18116

242.   Plaintiff incorporates all allegations of this Complaint by reference as if set forth in full herein.

243.   Defendant is a recipient of Federal funding and has been at all relevant times, and thus is subject to Section 1557.  It is not relevant to determine which part of its programs or activities received or receive Federal funding because receipt of any Federal financial assistance for any program or activity makes the statute applicable.

244.   Section 1557 of the ACA, 42 U.S.C. § 18116(a) provides:

> Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and

available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

245. By incorporating title IX by reference, the statute prohibits denial of the benefits of healthcare, or otherwise subjecting a person to discriminatory treatment "on the basis of sex", because title IX prohibits discrimination on this "ground."  20 U.S.C. § 1681(a).

246. Sexual Orientation is a subset of the class of sex. Discrimination on the basis of sexual orientation "necessarily entails discrimination on the basis of sex." *Bostock v. Clayton County*, 590 U.S. __ , 140 S. Ct. 1731, 1747 (2020).  *See also Hively v. Ivy Tech Cmty. Coll.*, 853 F.3d 339 (7th Cir. 2017).

247. *"*Though *Bostock* was a Title VII case, the Supreme Court's reasoning applies equally outside of Title VII." *Bos. All. of Gay, Lesbian, Bisexual v. United States Dep't of Health & Human Servs.*, 557 F. Supp. 3d 224, 244 (D. Mass. 2021).

248. In determining whether a conduct, practice or treatment is discriminatory, consideration must be given to sex specific characteristics and conditions. *See Newport News Shipbuilding & Drydock Co. v. EEOC*, 462 US 669, 676-78, 103 S.Ct. 2622 (1983). The law is not "blind" to healthcare needs that are associated with "unique sex based characteristics." *Erickson v Bartell Drug Co.*, 141 F. Supp. 2d 1266, 1271 (W.D. Wash. 2001).

249. The importance of unique psychological concerns of same sex attracted persons is evidenced by the fact that the APA has issued a report and guidelines specifically for psychological practice with lesbian, gay, and bisexual clients.

250. The central inquiry in determining whether a healthcare provider subjected the patient to discriminatory treatment in healthcare is whether the healthcare provider's actions or

omissions caused harm on the basis of sex, taking into account sex specific conditions relevant to the treatment.

251.    In the instant case the answer is affirmative. Defendant failed to carry out differential diagnosis and assess Plaintiff for internalized homophobia, a condition that is unique to same sex attracted individuals. The act of differentiating is the responsibility of the healthcare provider and not of the patient.

252.    Defendant did not follow either the DSM, ICD, APA Guidelines, or even the WPATH Standards of Care in conducting an assessment and making a diagnosis. Defendant disregarded scientific studies that showed internalized homophobia leads to transition regret.

253.    Defendant's numerous failures did not result from mere negligence or bad medical judgement, but rather were the result of willful and systemic indifference and apathy, evidenced by its decision to remove safety protocols from its transgender healthcare policy.

254.    In a case alleging discriminatory medical treatment under the Rehabilitation Act (29 U.S.C. § 794), the First Circuit Court of Appeals held that a medical decision that lacks "any reasonable medical support" may be found to be discriminatory.  The Court expounded:

> [T]he point of considering a medical decision's reasonableness in this context is to determine whether the decision was unreasonable *in a way that reveals it to be discriminatory*. In other words, a plaintiff's showing of medical unreasonableness must be framed within some larger theory of disability discrimination. For example, a plaintiff may argue that her physician's decision was so unreasonable-in the sense of being arbitrary and capricious-as to imply that it was pretext for some discriminatory motive, such as animus, fear, or "apathetic attitudes." (emphasis in original).

*Lesley v. Hee Man Chie*, 250 F.3d 47, 55 (1st Cir. 2001) (citing *Alexander v. Choate*, 469

U.S.                    287, 296, 105 S. Ct. 712 (1985)); *see, e.g. Howe v. Hull*, 874 F.

Supp. 779, 788-89 (N.D. Ohio                    1994)).

255.    Medical judgment results from a clinician's thought process that utilizes knowledge, skills, and experience in evaluation of objective medical information and subjective patient information in order to arrive at a diagnosis and a treatment plan. Medical judgment involves weighing of risks and benefits, positive and negative outcomes. Medical judgment uses standards of care as a benchmark in evaluating the range of medical and patient specific information relevant to treatment.

256.    Defendant did not exercise any medical judgment. Defendant implemented a one-size-fits-all affirmation-only model of care, engaged in medical rubber stamping, and prescribed hormones on demand without determining their necessity or monitoring their effect.

257.    Defendant's actions were not informed by objective medical knowledge or meaningful knowledge of Plaintiff. Defendant's judgment was informed by market expansion goals that  required responsiveness to political demands and ideological beliefs of transgender activists.

258.    Defendant had no legitimate medical basis for disposing of protective safeguards in its clinical decision-making and transgender health policies. Defendant had actual knowledge of the potential risk of harm that would result from discarding "gate-keeping" measures. Those safeguards would have protected Plaintiff from the harrowing harm that he sustained. Defendant's decision to remove safety protocols was arbitrary and capricious revealing an apathetic attitude toward patient safety.

259.    Defendant treated Plaintiff's sexual orientation with apathy and acted with willful and reckless indifference toward his sex specific condition of internalized homophobia.

260.    Plaintiff was subjected to discrimination and was disadvantaged in receiving healthcare because his sex specific condition relevant to the treatment was deliberately disregarded.

261.    Plaintiff was denied the benefits of healthcare because Defendant willfully ignored his sex specific ailments, and thus did not provide him with treatment that is relevant and appropriate for his condition.

262.    Defendant's conduct violated Section 1557's prohibition on discrimination on the basis of sex. An intentional violation of the ACA's nondiscrimination provision entitles a plaintiff to compensatory damages. *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 75, 112 S. Ct. 1028 (1992); *see also Cummings*, 596 U.S. 212.

263.    The standard of liability for determining violations of the ACA Section 1557 is unsettled.

264.    In *Rumble v Fairview Health Servs.*, Case No. 14-CV-2037 (SRN/FLN), 2015 U.S. Dist. LEXIS 31591, at *29-30 n.6 (D. Minn. Mar. 16, 2015), the Court noted that Congress likely intended that a singular standard of liability apply to a Section 1557 claim regardless of the ground for discrimination, although the Court did not reach the question of determining the applicable standard. Similarly, in *Jolley v. Riverwoods Behavioral Health, LLC*, 2021 WL 6752161, at *5 (N.D. Ga. Aug. 30, 2021), *citing Nix v. Advanced Urology Inst. of Georgia, P.C.*, No. 1:18-CV-04656-SDG, 2020 WL 7352559, at *3 (N.D. Ga. Dec. 14, 2020), *aff'd sub nom. Nix v. Advanced Urology Inst. of Georgia, PC*, No. 21-10106, 2021 WL 3626763 (11th Cir. Aug. 17, 2021), the Court adopted the singular standard principle, and ruled that claims under the ACA, ADA (the Americans with Disabilities Act) and the Rehabilitation Act are subject to the same standard.

265.     In contrast, the Sixth and the Ninth Circuit Courts of Appeals, have held the ACA "does not create a new health-care specific anti-discrimination standard." *Doe v CVS Pharm, Inc.,* 982 F.3d 1204, 1210 (9th Cir. 2020). To state a claim under Section 1557, plaintiff must allege facts adequate to state claim under the corresponding statute that supplies the "ground" for discrimination. *Id.* at 1210, *citing Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926 F.3d 235, 238 (6th Cir. 2019).

266.     In *Hammons v. Univ. of Md. Med. Sys. Corp.*, Civil Action No. DKC 20-2088, 2023 U.S. Dist. LEXIS 2896*, at *19-20 (D. Md. Jan. 6, 2023), the Court applied title VII on the basis that the Fourth Circuit Court of Appeals has applied those standards to title IX claims. However, the First Circuit Court of Appeals has not favored the extension of title VII standards to title IX cases outside the scope of employment disputes, because the two statutes have different scope and purpose. *Cohen v Brown Univ.,* 101 F.3d 155, 176 (1st Cir. 1996).

267.     In light of this diversity of approaches, Plaintiff takes note of the Seventh Circuit's holding in a title IX claim, that there is "no need to superimpose doctrinal tests on the statute." *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019). The purpose of the tests is to provide a method for showing discrimination, however, the question can be posed directly, if taken as true, do the alleged facts prove discriminatory conduct and intent?  *Ibid.*

268.     In search for a relevant test, Plaintiff first looks to title IX, and then to the ADA and the Rehabilitation Act. Title IX supplies the "ground" for discrimination in the instant case. Title IX covers discrimination in a variety of settings from employment to athletics, harassment and disciplinary hearings. Each setting has merited its own standard of liability suitable to its particular features. The most analogous setting to the instant case is

harassment, because in both instances a claim is made against the institution for discriminatory conduct of individuals over whom it exercises control, and further, clinics like schools have a duty of care to those in their care.

269. To establish a claim of discriminatory intent in harassment cases under title IX, a plaintiff must show that the defendant had (1) actual notice of the discriminatory conduct, (2) authority to take corrective measures, and (3) was deliberately indifferent toward the discriminatory conduct. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 118 S. Ct. 1989 (1993); *Davis v. Monroe Cty. Sch. Bd.*, 526 U.S. 629, 633, 646, 119 S. Ct. 1661 (1999).

270. For the purpose of the ADA and the Rehabilitation Act, discriminatory intent is inferred from the defendant's exhibition of deliberate indifference toward the substantial likelihood that its actions would violate a federally protected right. *Gray v. Cummings*, 917 F.3d 1, 18 (1st Cir. 2019) (citing *Crane v. Lifemark Hosps., Inc.*, 898 F.3d 1130, 1135-1136 (11th Cir. 2018); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1140 (9th Cir. 2001).

271. Plaintiff has established:

1. Defendant knowingly and willingly abandoned generally accepted procedures for providing medicalized transition that included protective safeguards known as "gate-keeping", and instituted a new, self-invented, and untested model of care that lacked any protective safeguards.

2. Defendant's decision to abandon generally accepted procedures was not justified or motivated by any new empirical evidence, rather it was a motivated by increasing its number of patients, and thus it was an arbitrary decision.

3. Defendant had actual knowledge that the removal of safeguards increased the risk of harm to patients, in particular to its gay and lesbian patients who may suffer from internalized homophobia.

4. Defendant had control and authority over the context of care and gave systemic effect to its new, untested model of care by training and instructing its staff in its implementation.

5. Defendant is well informed about the ACA and its prohibition on discrimination in healthcare. It deliberately and recklessly gave systemic effect to its untested model of care in the face of substantial likelihood that it could cause a breach of its legal duty not to discriminate on the basis of sex.

6. Defendant viewed all mental health ailments through the transgender lens and disregarded conditions associated with sex and sexual orientation, and thus, Defendant did not perform differential diagnosis.

7. Defendant was deliberately, recklessly, and callously indifferent toward Plaintiff's safety by not assessing Plaintiff for the sex specific condition of internalized homophobia, particularly, when its symptoms were glaringly present.

8. Defendant's affirmation therapy unduly influenced Plaintiff by narrowing his field of vision and interfered with his personal growth and free development of personality. Defendant failed to explore Plaintiff's feelings surrounding his sex and sexual orientation, and encouraged him through affirmation to solidify a transgender identity and to accept harmful and irreversible treatments which would not have been available to him but for Defendant's prescriptions and letters of approvals.

9.   Defendant's actions adversely altered Plaintiff's life trajectory by exacerbating his real ailments which were left unidentified and untreated, and by causing new mental and physical maladies by needlessly and recklessly supplying unnecessary medicines and approving unnecessary and radical surgical procedures.

272.   Plaintiff satisfies the standards of liability for title IX, and also for the ADA and the Rehabilitation Act, and even without those tests, the totality of facts and circumstances support Plaintiff's claim of intentional discriminatory conduct. Plaintiff has suffered discrimination in fact.

273.   Based on the foregoing, Defendant intentionally subjected Plaintiff to discrimination in healthcare and denied him the benefits of healthcare on the basis of sex and sexual orientation in violation of Section 1557. Plaintiff is entitled to compensatory damages.

**REQUEST FOR JURY TRIAL FOR DAMAGES**

274.   Pursuant to Fed. R. Civ. P.  38(c), Plaintiff requests a trial by jury for the specific issue of damages.

**PRAYER FOR RELIEF**

275.   WHEREFORE, Plaintiff requests relief for damages caused by Defendant's breach of its nondiscrimination obligation, as follows:

1.   Compensatory damages for the following direct actual damages:

    1.   loss of past and future income;

    2.   past and future medical expenses;

    3.   unnecessary life long medical dependence;

    4.   bone damage;

    5.   loss of penis and testicles;

    6.   disfigurement;

    7.   sterilization;

    8.   latent harm;

    9.   psychological injury;

    10. cognitive injury;

    11. loss of enjoyment of sexual relations; and

    12. pain and suffering on the account of physical and psychological injury.

2.      Attorney's fees and costs under 42 U.S.C. § 1988(b).

3.      Such other relief as the Court deems just and proper.


                             Respectfully submitted,

                             July R. Carlan

                             By his Attorneys,

Dated: February 14, 2024          */s/ Mitra N. Forouhar*
                             Mitra N. Forouhar (NY Bar No. 2435683)
                             77 Van Ness Ave. Ste 101
                             PMB 1319
                             San Francisco, CA 94102
                             mitra@mnf-law.com
                             (415) 602-1864

                             *Admitted pro hac vice*


                             Samuel P. Blatchley (BBO No. 670232)
                             ECKLAND & BLANDO LLP
                             22 Boston Wharf
                             Road 7th Floor
                             Boston, MA 02210
                             (617) 217-6937
                             sblatchley@ecklandblando.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 14, 2024, I electronically filed the within document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

<u>*/s/ Samuel P. Blatchley*</u>
Samuel P. Blatchley