UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JULY R. CARLAN a/k/a/ Shape Shifter, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 23-12361-MJJ |
| FENWAY COMMUNITY HEALTH CENTER, INC., | ) ) ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM OF DECISION**

March 28, 2025

JOUN, D.J.

July R. Carlan, a.k.a. Shape Shifter ("Plaintiff" or "Mr. Carlan"), brings a claim against

Fenway Community Health Center, Inc. ("Defendant" or "Fenway") for sex discrimination under

42 U.S.C. § 18116 ("Section 18116") of the Patient Protection and Affordable Care Act

("ACA"). Mr. Carlan alleges that Fenway adopted unscientific, experimental medical treatments

instead of generally accepted clinical guidelines for transgender healthcare. [*See* Doc. No. 18].

As a result, Fenway failed to uncover and diagnose Mr. Carlan's internalized homophobia, along

with other psychological conditions, resulting in an irreversible transgender surgery that has

caused Mr. Carlan both psychological and physical pain and suffering. [*See generally id.*].

Before me are Fenway's Motion to Dismiss and to Substitute the United States as a

Defendant, [Doc. No. 10], the United States' Motion to Intervene, [Doc. No. 27], and Mr.

Carlan's Motion for Leave to Conduct Limited Subject Matter Discovery, [Doc. No. 20]. For the

reasons below, the United States' Motion is <u>GRANTED</u>, Mr. Carlan's Motion for Limited

Discovery is <u>DENIED</u>, and Fenway's Motion to Dismiss and Substitute is <u>DENIED</u>, as moot.

## I.     BACKGROUND

### A.     <u>Mr. Carlan's Care At Fenway Health</u>

Mr. Carlan began receiving care at Fenway in November of 2012. [Doc. No. 18 at ¶ 55].

Mr. Carlan initially met with Julie Thompson, a physician's assistant ("PA") at Fenway to

inquire about hormone therapy. [*Id.*]. Mr. Carlan told PA Thompson that he had begun to live

full-time as female since the past summer and that he wished to change his gender. [*Id.* at ¶ 56].

He also informed her of four other "key facts: (1) his parents were not accepting of his

homosexuality; (2) he had sexual experience at age 11 that was 'consensual;' (3) he engages in

high risk sexual behavior by having receptive, anal sex with multiple men without using a

condom; and (4) the 'barrier' to his use of condoms is his 'desire for pregnancy.'" [*Id.* at ¶ 62].

After this initial meeting, PA Thompson formally diagnosed Mr. Carlan with Hormone Disorder

without adequately discussing and exploring Mr. Carlan's experiences with him and despite a

base test of Mr. Carlan's hormone levels in January 2013 indicating no hormonal imbalance or

disorder. [*Id.* at ¶¶ 64-68].

On December 27, 2012, Mr. Carlan met with Sarah Frawley, LMHC for a behavioral

health diagnostic and intake evaluation. [*Id.* at ¶ 69]. At this appointment, Mr. Carlan reported

adopting a transgender identity by "assuming more feminine expression, dressing and obsessing

with getting pregnant," but was not certain about genital surgery. [*Id.* at ¶ 72]. Mr. Carlan also

disclosed to Ms. Frawley that he had previously identified as gay but that he now identified as

heterosexual and has many male sexual partners. [*Id.* at ¶ 74]. Mr. Carlan further detailed a

history of childhood abuse by his mother, experiences of assault due to his sexual orientation and

gender, difficulty coming out as gay to his parents, the desire to be more like his sister because of how she "deals with their parents." [*Id.* at ¶¶ 70-71]. He disclosed symptoms of depression, high risk sexual behavior, and unstable relationships. [*Id.* at ¶ 74]. Rather than thoroughly evaluating Mr. Carlan for the myriad conditions these symptoms and experiences may indicate—such as internalized homophobia and borderline personality disorder—Ms. Frawley diagnosed Mr. Carlan with "major depressive disorder" and "risky sexual behavior." [*Id.* at ¶¶ 74-90]. She recommended exploration of Mr. Carlan's high risk sexual behavior and gender identity, how they might relate to his depression, and how these conditions might be affected if he continues with transition. [*Id.* at ¶ 78]. The record does not indicate that these minimal recommendations were in fact followed. [*Id.*].

At the end of his appointment with Ms. Frawley, Mr. Carlan was cleared for hormone therapy. [*Id.* at ¶ 91]. He was given a two-page list of potential side effects; however, no effort was made to explain those side effects or ascertain whether Mr. Carlan truly appreciated those risks. [*Id.* at ¶ 93]. Mr. Carlan gave his signature indicating his consent to this treatment, and on January 14, 2013, based on Mr. Carlan's single appointment with Ms. Frawley, PA Thompson began prescribing Mr. Carlan estrogen. [*Id.* at ¶¶ 93, 99]. Neither provider performed a meaningful evaluation to distinguish the presence of gender dysphoria from gender nonconforming behavior or other psychological conditions that imitate gender dysphoria, or to assess Mr. Carlan's level of comfort with his sexual orientation and its relationship to his recent identification as transgender. [*Id.* at ¶ 117]. Within two months of taking hormones, Mr. Carlan's depression significantly worsened. [*Id.* at ¶ 118]. On March 22, 2013, he reported crying daily for no specific reason, a lack of motivation, and the inability to concentrate on schoolwork. [*Id.*].

PA Thompson failed to appropriately monitor these symptoms and to recognize them as a counter-indication to the continuation of hormone therapy. [*Id.*].

On March 4, 2013, Mr. Carlan met with Mark Rehrig, LICSW, who validated Mr. Carlan's gender identity and disregarded his sexual orientation. [*Id.* at ¶ 120]. Mr. Rehrig diagnosed Mr. Carlan with "internalized transphobia" because of Mr. Carlan's desire to "be seen as more than a trans woman." [*Id.* at ¶ 124]. Rather than engaging in informational discussions with Mr. Carlan, Mr. Rehrig and other Fenway practitioners encouraged Mr. Carlan's transition and overlooked his desire to "escape being a real man who is sexually attracted to men," because of Fenway's affirmation-only model and transgender bias [*Id.* at ¶¶ 125, 130, 133, 256]. Because of Fenway's "[u]ndue influence exercised through affirmation, use of false labels, and prescriptions of unnecessary and counter-indicated hormones, by the end of July 2013, Plaintiff was seeking referrals for multiple cosmetic surgeries to feminize his face and body and expressing interest in Gender Reassignment Surgery ("GRS")". [*Id.* at ¶ 134].

On November 4, 2013, PA Thompson reported that Mr. Carlan had been on hormones for eleven months with no negative side effects and increased his prescribed dose of estrogen despite Mr. Carlan's worsening depression, and also inexplicably diagnosed Mr. Carlan with a birth defect that appears in females and cannot appear in men without a cervix. [*Id.* at ¶ 135]. By mid-December of 2013, Mr. Carlan reported inconsistent use of hormones and testosterone blockers to regain erectile function and was engaged in high-risk sexual behavior. [*Id.* at ¶ 136]. Nonetheless, Mr. Carlan was encouraged by Fenway to visit a conference in Boston sometime around January of 2014 to find plastic surgeons who perform cosmetic feminization surgeries. [*Id.* at ¶ 137]. He did not visit Fenway again for almost one year while he underwent multiple cosmetic surgeries on his face and body. [*Id.*]

4

On December 12, 2014, Mr. Carlan met with Sarah Eley, LICSW, requesting psychotherapy and letters of approval for GRS. [*Id.*]. Notwithstanding symptoms typically associated with borderline personality disorder and internalized homophobia, Ms. Eley continued to encourage affirmation therapy for Mr. Carlan. [*Id.* at ¶¶ 138, 142, 144]. She recommended one year of individual psychotherapy with a focus on gender affirmation, covering necessary information to obtain letters for GRS referral. [*Id.* at ¶ 149]. There is no indication that any of her recommendations except gender affirmation were implemented or that Plaintiff's symptoms ameliorated. [*Id.* at ¶ 150].

Mr. Carlan met with another Fenway social worker, Samantha Manewitz, to begin behavioral health treatment on February 18, 2015. [*Id.* at ¶¶ 151]. He reported acute dysphoria around his genitals and that he hoped his libido would decrease once he underwent GRS. [*Id.*] Ms. Manewitz never explained to Plaintiff that GRS is not a treatment for hypersexuality. [*Id.* at ¶ 154]. She recommended nine months of therapy. [*Id.* at ¶ 152]. Clinical notes from ten sessions between February and July of 2015 indicate her affirmation of Mr. Carlan's transgender identity, straight sexual orientation, diagnosis of internalized transphobia, continued compulsive and high risk behavior, and inability to maintain interest in relationships or set boundaries. [*Id.* at ¶ 155]. Although these are indicators of borderline personality disorder and internalized homophobia, Ms. Manewitz did not consider such diagnoses and "took a disjointed view of the patient's condition as an unrelated set of symptoms." [*Id.*]. On March 11, 2015, during or after the second session of therapy, Ms. Manewitz signed a GRS approval letter. [*Id.* at ¶ 158]. The letter is co-signed by Kevin Kapila, MD, approving Mr. Carlan for castration without meeting him. [*Id.*].

Between February and June of 2015, Mr. Carlan met with Alex Keuroghlian, MD, to get a second GRS approval leter. [*Id.* at ¶ 159]. Three of the meetings were only twenty minutes

5

long. [*Id.*]. Session notes reflect brief, superficial discussions and conclusory assessment of Mr.

Carlan's conditions as well as an unfamiliarity with his history that is reflected in Fenway's

treatment records. [*Id.* at ¶¶ 159-60]. Dr. Keuroghlian signed a second GRS approval surgery on

June 5, 2015. [*Id.* at ¶ 161].

Fenway did not evaluate Mr. Carlan's condition, expectations, or his capacity for medical

decision making in this context. [*Id.* at ¶ 163]. Fenway did not ascertain Mr. Carlan's

expectations about transition or inform him of the limitations of undergoing this surgery. [*Id.* at ¶

164]. Despite all of this, Mr. Carlan underwent GRS.[1] Because of this procedure and the

treatment prescribed and overseen by Fenway, he now suffers from sexual dysfunction,

osteoporosis, scoliosis, and persistent mental fog. [*Id.* at ¶¶ 199-200]. After seeking therapy in

February of 2022, Mr. Carlan came to realize that he had body dysmorphia, unresolved

childhood trauma, borderline personality disorder, and internalized homophobia. [*Id.* at ¶¶ 225-

226]. In May of 2022, Mr. Carlan publicly announced that he is a detransitioner. [*Id.* at ¶ 228].

Because of Fenway's actions, Mr. Carlan suffered irreversible physical and mental harm. [*Id.* at ¶

196]. This includes having to live the rest of his life with "dissonance between who he is and

how he appears" including "not being able to express himself as a gay man." [*Id.* at ¶¶ 204, 229].

## B.   Fenway Health

Fenway is a federally qualified health center that was receiving federal funding when it

provided medical care to Mr. Carlan. [*Id.* at ¶ 28]. The Secretary deemed Fenway a Public Health

Service ("PHS") employee under 42 U.S.C. § 233 for the years 2012-15, which includes those

years in which Mr. Carlan received medical treatment. [Doc. No. 10-2 at 2-3; Doc. No. 27-1]. In

---

[1] Mr. Carlan does not state specifically when he had the procedure. He references "post-GRS therapeutic records, dated October 2015 – January 2016." [*Id.* at ¶ 213]. I deduce that Mr. Carlan's GRS was sometime on or before October 2015.

this action "the United States Attorney, as the Attorney General's authorized delegate, has

determined [under U.S.C. § 233(b) & 28 C.F.R. § 15.4(b)], based on information presently

available, that Fenway was acting as a covered person in circumstances where Congress provides

by statute, in this case 42 U.S.C. § 233(a), that the FTCA's remedy against the United States is

exclusive." [Doc. No. 27 at 2; Doc. No. 27-1].

Fenway is a "community health service whose patients primarily come from the

LGBTQIA+ community." [Doc No. 18 at ¶ 28]. In 2007, Fenway implemented a change in its

practice surrounding the care of transgender patients, determining that Fenway's commitment to

patient safety led to conflicts with patients because "adherence to these [safety] priorities was

time-consuming, and Fenway wasn't as quick to meet patients' expectations." [*Id.* at ¶ 29

(quoting Doc. No. 18-1 at 9) (alteration in quotation)]. Fenway eliminated the "established

generally accepted clinical guidelines, recognized by Defendant as 'evidence based'" and

eliminated the requirement of extensive counseling prior to a patient receiving gender

affirmation services. [Doc. No. 18 at ¶¶ 30, 32-33]. Rather, the "reduced standards" called for a

brief single assessment of a patient before receiving such services despite "no scientific evidence

that a single assessment would be sufficient or safe." [*Id.* at ¶¶ 33-34]. Fenway called this the

"modified informed consent model." [*Id.* at ¶ 42].

### C.    The Public Health Service Act Section 233

The Public Health Service Act ("PHSA"), as amended by the Federally Supported Health

Centers Assistance Act of 1992 ("FSCHCAA"), 42 U.S.C. § 233, ("Section 233") immunizes

"officers and employees of the PHS from personal liability 'for damage for personal injury,

including death, resulting from the performance of medical, surgical, dental, or related functions'

while acting within the scope of their employment.'" *O'Brien v. United States*, 56 F.4th 139, 147

(1st Cir. 2022) (cleaned up) (quoting 42 U.S.C. § 233(a)); *Hui v. Castaneda*, 559 U.S. 799, 806 (2010) ("Section 233(a) grants absolute immunity to PHS officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment by barring all actions against them for such conduct"). In lieu of such personal liability, the PHSA authorizes "a tort action against the United States under the [Federal Tort Claims Act ("FTCA")] as the 'exclusive' remedy for certain 'act[s] or omission[s]' on the part of [immunized] employees resulting in personal injury or death." *O'Brien*, 56 F.4th at 147 (quoting 42 U.S.C. § 233(a)). The FSCHCAA extended this protection to "public or non-profit private entit[ies]" that receive certain federal health grant funds, subject to certain conditions. 42 U.S.C. § 233(g)(4); see 42 U.S.C. § 233(g)(1)(A); *see O'Brien*, 56 F.4th at 148 ("Under the [FSHCAA], public or non-profit private health centers receiving federal funds under 42 U.S.C. § 254b — as well as . . . employees . . . of such entities — are eligible for the same PHSA and FTCA protections as are enjoyed by PHS employees.").

To receive immunity, "a federally funded health center or any particular individual associated with it must be 'deemed to be an employee' of the PHS." *O'Brien*, 56 F.4th at 148 (quoting 42 U.S.C. § 233(g)(1)(A)); *see also* 42 U.S.C. § 233(g)(1)(D), g(4), (h). The Secretary of Health and Human Services (the "Secretary") has the "authority to deem an entity or affiliated individual an employee of the PHS — both generally and for purposes of a specific lawsuit." *Id.* (citing 42 U.S.C. § 233(g)(1)). And "the Secretary's 'deeming' determination 'appl[ies] with respect to services provided' to 'all patients of the entity.'" *Id.* at 149 (citing 42 U.S.C. § 233(g)(1)(B)(i)); *see also* 42 U.S.C.A. § 233(g)(1)(F) ("Once the Secretary makes a determination that an entity or an officer, governing board member, employee, or contractor of an entity is deemed to be an employee of the Public Health Service for purposes of this section,

8

the determination shall be final and binding upon the Secretary and the Attorney General and other parties to any civil action or proceeding."). 42 U.S.C. § 233(b) authorizes the Attorney General to defend any damages action against PHS employees based on injuries covered by 42 U.S.C. § 233(a), if the Attorney General or an authorized designee determines that the criteria to assume the defense of the case are satisfied under § 233(b).

### D.   The Affordable Care Act Section 18116

Section 18116 of the ACA prohibits any health organization that receives federal financial assistance from discriminating against an individual on a ground prohibited by Title IX of the Education Amendments of 1972, Title VI of the Civil Rights Act of 1964, or the Age Discrimination Act of 1975. 42 U.S.C. § 18116(a). Section 18116 specifically provides:

> Except as otherwise provided for in this title (or an amendment made by this title), ***an individual shall not, on the ground prohibited under*** title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), ***title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)***, the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of Title 29, ***be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance***, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

*Id.* (emphasis added). Title IX prohibits discrimination "on the basis of sex," 20 U.S.C. § 1681, which has been read to include discrimination on the basis of sexual orientation, gender identity, or transgender status. *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 669, 683 (2020) (discussing the definition of "sex" in Title VII to include discrimination on the basis of transgender identity or sexual orientation); *Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. United States Dep't of Health & Hum. Servs.*, 557 F. Supp. 3d 224, 244 (D. Mass. 2021) ("Though Bostock was a Title VII case, the Supreme Court's reasoning applies equally outside

of Title VII"). Mr. Carlan argues that he was "subjected to discrimination and was disadvantaged in receiving healthcare because his sex specific condition relevant to the treatment was deliberately disregarded" and was "denied the benefits of healthcare because Defendant willfully ignored his sex specific ailments, and thus did not provide him with treatment that is relevant and appropriate for his condition." [Doc. No. 18 at ¶¶ 260-262]. There is no requirement that a Section 18116 or Title IX Plaintiff must exhaust administrative remedies prior to bringing a claim. *See* 42 U.S.C. § 18116(b) ("Nothing in this title . . . shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)"); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 708, n. 41 (1979).

## II.    PROCEDURAL HISTORY

On October 12, 2023, Mr. Carlan filed this action, bringing a claim for sex discrimination under Section 18116 of the ACA against Fenway (Count I). [Doc. No. 1]. On January 22, 2024, Fenway filed a Motion to Dismiss the Complaint for lack of subject matter jurisdiction and for failure to state a claim, and to substitute the United States as defendant. [Doc. No. 10]. On February 14, 2024, Mr. Carlan filed an Amended Complaint, [Doc. No. 18], an opposition to the motion to dismiss and to substitute, [Doc. No. 19], and a Motion for Leave to Conduct Limited Discovery concerning subject-matter jurisdiction, [Doc. No. 20]. The United States filed a Motion to Intervene on May 13, 2024. [Doc. No. 27]. Mr. Carlan filed an opposition on May 16, 2024, [Doc. No. 28], and an amended opposition on May 21, 2024, [Doc. No. 29]. A hearing on the pending Motions was held on July 18, 2024 [Doc. No. 33].

## III.  LEGAL STANDARD

"[O]n timely motion, the court must permit anyone to intervene who (1) is given an unconditional right to intervene by a federal statute." Fed R. Civ. P. 24(a)(1). "[T]o succeed on a motion to intervene under Rule 24(a)(1), a potential intervenor need only demonstrate (1) that its motion is timely and (2) that the statute clearly applies." *Photographic Illustrators Corp. v. Orgill, Inc.*, 316 F.R.D. 45, 48 (D. Mass. 2016); *Moosehead Sanitary Dist. v. S. G. Phillips Corp.*, 610 F.2d 49, 52 n. 6 (1st Cir. 1979) ("[A] party may intervene as of right upon timely application if unconditionally authorized to do so by federal law").

## IV.  ANALYSIS

The central question is whether Section 233 applies to encompass claims brought under Section 18116 of the ACA. If it does, then Fenway is immune, and Mr. Carlan's exclusive remedy is to seek an action against the United States under the FTCA. If it does not, then Mr. Carlan's ACA claim may proceed. I find that Section 233 does apply and the United States' Motion to Intervene should be granted. Because there is substantial overlap between the United States' and Fenway's arguments regarding the applicability of Section 233 to this action, and Plaintiff's Oppositions thereto, I need only reach the parties' arguments regarding the applicability of Section 233, and reserve judgment on whether Mr. Carlan has exhausted his remedies under the FTCA for briefing to be submitted by the United States.

### A.    The Applicability of Section 233

The United States argues that intervention is appropriate because Mr. Carlan's allegations that he was harmed as a result of Fenway's failure to perform a proper medical assessment in accordance with clinical guidelines, failure to properly diagnose Plaintiff, and Fenway's "unnecessary and harmful medical interventions of transgender transition" are "injuries resulted

from the performance of medical functions within the scope of Fenway's duties, making the

exclusive remedy in this case a tort action against the United States under the FTCA." [Doc. No.

27 at ¶ 5]. The United States argues that it does not matter that "Plaintiff has styled his cause of

action as a discrimination claim" under the ACA. [*Id.* at ¶ 6]. I agree.

In *Hui*, the Supreme Court held that Section 233 should be read broadly to cover any

actions arising from the performance of medical functions:

> Section 233(a) grants ***absolute immunity to PHS officers and employees for***
> ***actions arising out of the performance of medical or related functions within the***
> ***scope of their employment*** by barring all actions against them for such conduct. By
> its terms, § 233(a) limits recovery for such conduct to suits against the United
> States. The breadth of the words "***exclusive***" and "***any***" supports this reading, as
> does the provision's inclusive reference to all civil proceedings arising out of "the
> same subject-matter." We have previously cited § 233(a) to support the contention
> that "Congress follows the practice of explicitly stating when it means to make
> FTCA an exclusive remedy." The meaning of § 233(a) has become no less explicit
> since we last made that observation.

559 U.S. at 806 (cleaned up) (emphasis added). The Court held that "[l]anguage that broad easily

accommodates both known and unknown causes of action." *Id.*[2]

As an in initial matter, Mr. Carlan's claim can appropriately be considered a claim arising

from a personal injury resulting from Fenway's "performance of medical or related functions

within the scope of their employment."[3] *Id.* The crux of Mr. Carlan's claim is that employees at

---

[2] Mr. Carlan argues that *Hui* is distinguishable from the present case, because *Hui* discussed the
application of the FTCA to a judicially created cause of action, and not a statutory cause of action. [Doc.
No 29 at 2]. While this is true—*Hui* held that *constitutional* claims under *Bivens v. Six Unknown Fed.
Narcotic Agents*, 403 U.S. 388 (1999), were precluded under the PHSA—courts *have* found that the
PHSA may preclude statutory claims. *Pinzon vs. Mendocino Coast Clinics Inc.*, 2015 WL 4967257 at *3
(N.D. Cal. Aug. 20, 2015) (citing to *Hui* and holding that plaintiff's claims against health clinic for
discrimination under the Americans with Disabilities Act and Civil Rights Act fall within the purview of
sections 233(a) and (g)); *Huynh vs. Sutter Health*, 2021 WL 4168605, at *7 (E.D. Cal. Sept. 14, 2021)
("Plaintiff's discrimination claims against [Defendant's employee] under [California's] Unruh Act . . .
arise from 'medical, surgical, . . . or related functions,' as provided by § 233").

[3] I do not find persuasive Mr. Carlan's argument that because Fenway replaced generally accepted
procedures with its own model for transgender medical care, that it "*prime facie* exceed[ed] the scope of
providing quality health care and efforts to reduce risks to patients." [Doc. No. 19 at 15]. Permitting this

Fenway failed to exercise proper medical judgment. [Doc. No. 27 at ¶ 4 (citing Doc. No. 18 at ¶¶

10, 11, 134, 256)]. Instead, Fenway allegedly followed a "one-size-fits-all affirmation-only

model of care" by prescribing hormones on demand and recommending GRS, and in doing so,

allegedly neglected to make any differential diagnosis or evaluate Mr. Carlan for psychological

conditions that mimic gender dysphoria. [*Id.*]. Such claims certainly involve the medical and/or

medically related functions of providing treatment and ensuring that Fenway follows generally

accepted clinical guidelines. *See e.g.*, *Pomeroy v. United States*, 2018 WL 1093501, at *4 (D.

Mass. Feb. 27, 2018) (nursing home's negligence in failing to monitor meals for woman with a

known swallowing disability constitutes a "medical . . . or related function[]" under 42 U.S.C. §

233(a)).

Mr. Carlan argues that there is a distinction between "medical negligence" and "medical

treatment," where his claims are instead based on a deliberate indifference toward a protected

characteristic. But "[t]here is nothing in the FSHCAA which limits the defendants' liability to

actions in negligence only." *Teresa T. v. Ragaglia*, 154 F. Supp. 2d 290, 299 (D. Conn. 2001).

Further, courts have explicitly stated that § 233(a) is not limited to medical malpractice claims.

*Cuoco v. Moritsugu*, 222 F.3d 99, 108 (2d Cir. 2000) ("[T]here is nothing in the language of §

233(a) to support [the] conclusion" that "§ 233(a) provides immunity only from medical

malpractice claims"); *Pomeroy*, 2018 WL 1093501, at *3 ("At minimum, the Court is

---

inference would allow any Plaintiff who is unhappy with or disagrees with the medical care they received
to bypass the immunity protections of Section 233 by claiming that the alleged incident "exceeded the
scope of employment." Further, "proof of scope is in most § 233(a) cases established by a declaration
affirming that the defendant was a PHS official during the relevant time period." *Hui*, 559 U.S. at 811.
The United States has submitted evidence of FTCA notices deeming Fenway an employee of the PHS
from 2012 to 2015, the time when Plaintiff received treatment at Fenway. [*See* Doc. No. 18; Doc. No. 27-
1]. I do not find that there is a material factual dispute over whether Fenway was acting within the scope
of its employment when providing Mr. Carlan with medical treatment. Mr. Carlan's motion for leave to
conduct limited subject-matter discovery on this point is <u>DENIED</u>.

unconvinced that Mendez limits viable FSHCAA claims in this Circuit to medical malpractice claims alone"); *Mele v. Hill Health Ctr.*, 2008 WL 160226, at *3 (D. Conn. Jan. 8, 2008) ("Although section 233(a) primarily provides immunity for individual PHS employees from medical malpractice claims, it also provides immunity for other claims"); *Logan v. St. Charles Health Council, Inc.*, 2006 WL 1149214, at *2 (W.D. Va. May 1, 2006) ("[N]either the language of the statute nor the relevant case law support that construction limiting § 233 only to medical malpractice cases").

Courts have read Section 233 broadly and have found a range of claims to fall within its scope. *Huynh,* 2021 WL 4168605, at *7 ("[T]he scope of immunity provided to federally funded healthcare centers [like Defendant's] and [their] employees is a broad one under 42 U.S.C. § 233(a)); *see id.* (discrimination claim brought under state civil rights statute fell under section 233). For example, in *Cuoco*, plaintiff brought constitutional claims alleging that they were misdiagnosed by two PHS doctors who did not believe plaintiff was transsexual and prescribed plaintiff the wrong course of medical treatment. 222 F.3d at 107. The court found that Section 233 applied to cover plaintiff's allegations because the "complained of behavior . . . occurred within the scope of their offices or employment and during the course of their 'performance of medical … or related functions.'" *Id.* (quoting 42 U.S.C. § 233(a)); *Pomeroy*, 2018 WL 1093501 at *2 ("The statute must cover a broader scope of activity than the delineated categories alone, or else 'related functions' would be mere superfluity.").

Additionally, in *Mele*, the court held that "[a]lthough section 233(a) primarily provides immunity for individual PHS employees from medical malpractice claims, it also provides immunity for other claims. For example, the defendants would be immune from a claim that they violated Mele's constitutional rights while providing medical or related services. They would

14

not, however, be protected against violating Mele's constitutional rights while preforming

something other than a medical or related function." 2008 WL 160226 at *3 (cleaned up). In

*Mele*, the plaintiff sued a health center for constitutional violations and violations of the

Americans with Disabilities Act. *Id.* at *1. Plaintiff was receiving drug treatment at the health

center as an alternative to incarceration. *Id.* at *1. Plaintiff alleged that defendants were

"deliberately indifferent to his serious medical needs" and "improperly disclosed his medical

information," and improperly terminated him from the program. *Id.* at *3. The court held that

plaintiff's claims concerning deliberate indifference of his medical needs and improper

disclosure of his medical information "concern[ed] the medical functions of providing treatment

and the related function of ensuring the privacy of patient medical information." *Id.* at *3. The

court granted in part defendant's motion to substitute with respect to those claims, but denied the

motion with respect to plaintiffs' claims that he was improperly terminated from the program.

Like *Cuoco* and *Mele*, Mr. Carlan's claims clearly "concern the medical functions of

providing treatment." *Id.* Given the broad scope of Section 233, I find it is appropriate that Mr.

Carlan's claims fall within its purview.

### B.    The Canons Of Statutory Construction

Plaintiff's remaining arguments that Section 18116 precludes the application of Section

233 are unpersuasive. Plaintiff argues that the canons of statutory construction should be applied

to resolve "conflicts" between statutes. Plaintiff argues that the following canons apply:

- *Expressio unius est exclusion alterius (The expression of one thing is the exclusion of another)*: Plaintiff argues that Section 18116 created a remedy to enforce a right that did not exist and permitted Plaintiff to bring his action for discrimination that would not have otherwise been possible, so Section 18116's enforcement provision should be followed without reading unwritten exceptions into it.

- *In pari materia (Related statutes that deal with the same subject matter should be read together)*: Plaintiff argues that Section 233 addresses personal injury due to medical services,

which is distinguishable from Section 18116, which covers discrimination in health activity; so, the two statutes are not related and should not be read together.

- *Generalia specialibus non derogant (The specific governs over the general)*: Plaintiff argues that Section 233 is a more general law, encompassing a wide array of personal injury actions relating to medical treatment, but Section 18116 is a more specific statute, focusing only on discrimination in any health activity by a federal funding recipient. So, Section 18116, as a specific law, creates an exception to Section 233's generality.

[*See* Doc. No. 19 at 7-10]. Plaintiff's arguments with respect to the application of these canons are both contradictory and conclusory. For instance, Plaintiff insists that Section 233 and Section 18116 "conflict" with one another. [*Id.* at 7]. But the first canon, *expressio unius est exclusion alterius*, necessarily requires an interpretation that Section 18116 creates a new remedy that Section 233 did not otherwise address, which does not demonstrate that the two statutes are in "conflict." And, as explained above, Plaintiff has a remedy for his injuries suffered because of alleged inappropriate medical treatment. Because the PHSA provides immunity to Fenway as a public health employee, the FTCA remedy simply *replaces* the remedy Plaintiff is seeking via the ACA and who Plaintiff can name as a defendant.[4]

Plaintiff next argues, under the canon of *in pari materia*, that the two statutes should not be read together because they address different subject matters—personal injury from medical care and discrimination from medical care. Alternatively, Plaintiff argues that if the two statues are read together, then Section 233 should be read narrowly to be confined to personal injury claims and not to discrimination claims. First, it is not plausible to conclude that the two statutes address different subject matters. Even if I were to conclude that the two statutes do address

---

[4] This point further resolves Plaintiff's argument that because Congress enacted Section 18116 pursuant to its spending powers, Section 233 cannot apply to Section 18116 claims that amount to a breach of a PHS employees' contractual obligations to refrain from discrimination as a condition of receiving federal funding. [Doc. No. 19 at 10-11]. Because the PHSA replaces the ACA remedy, the surviving claim would not require the United States to defend the breach of another party's obligations. Further, Plaintiff does not purport to bring a breach of contract claim as a third-party beneficiary to Fenway's receipt of federal funds under the ACA.

different subject matters, Section 233 has been read broadly. For example, in *Krandle v. Refuah Health Ctr., Inc.*, the court found that a data breach resulting from a healthcare non-profit's failure to safeguard plaintiffs' personal health information was covered by Section 233. 2024 WL 1075359, at *8-11 (S.D.N.Y. Mar. 12, 2024). Second, Plaintiff's arguments to this point are belied by his own conflicting characterization of the two statutes. *See* [Doc. No. 19 at 10 ("Section 233 is general law because it encompasses the entire class of personal injury actions arising from a wide range of medical and related functions of a narrow class of persons. Its operational subject is general and broad. By contrast, Section 18116 is a specific statute that focuses solely on discriminatory acts or omissions that are committed in the course of any health activity by the broad class of any recipient of Federal funding. The statute's prescribed field of action is narrow and specific to discriminatory behavior. Section 18116 is special law")]; [Doc. No. 29 at 4 ("[T]he language of [Section 18116] is expansive and encompasses any health activity or program that receives Federal financial assistance")]; [*Id.* at 5 ("Section 18116's provision that '*any* health program or activity, *any* part of which is receiving Federal financial assistance' (emphasis added) is unambiguous and sweeping")].

With respect to the last canon, *generalia specialibus non derogant*, after claiming that Section 233 should be read narrowly to only cover personal injury actions, Mr. Carlan argues that Section 233 is actually a more general law that encompasses a "wide range" of medical actions and only Section 18116 covers discrimination claims. [Doc. No. 19 at 10]. This argument itself conflicts with Mr. Carlan's arguments that Section 233 should be narrowly read, that the two statutes are directly in conflict, and that the two statutes are unrelated.

I do not find that there is any conflict between Section 18116 and Section 233. The key inquiry is the nature of the remedy that Plaintiff seeks. *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d

Cir. 2000) ("The question is therefore whether the injury for which Cuoco seeks compensation was one 'resulting from the performance of medical ... or related functions'") (citing 42 U.S.C. § 233(a)). Section 233 does not defeat the congressional intent of the ACA; it simply immunizes a PHS employee from a suit that seeks a remedy for the types of injuries that Mr. Carlan suffered. "When Congress has sought to limit immunity to medical malpractice claims it has done so explicitly." *Id.* at 108. Given the broad claims that have been found to fall under Section 233's purview, I find that Section 233 covers Plaintiff's claims here.

## V.    CONCLUSION

For the reasons explained above, the United States' Motion to Intervene [Doc. No. 27] is GRANTED, Mr. Carlan's Motion for Leave to Conduct Limited Subject Matter Discovery [Doc. No. 20], is DENIED, and Fenway's Motion to Dismiss and to Substitute the United States as a Defendant [Doc. No. 10], is DENIED as moot, and Fenway is dismissed from this action.[5] Plaintiff is granted leave to refile its complaint against the United States pursuant to the FTCA.


**SO ORDERED.**

/s/ Myong J. Joun
United States District Judge

---

[5] I take notice of Plaintiff's Notices of Supplemental Authority filed on July 3, 2024 and July 18, 2024. [Doc. Nos. 32, 34].